IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RUBICON US REIT, INC. et al., | ) | Case No. 10-10160 (BLS) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |

## DECLARATION OF ROBERT SAUNDERS IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS

I, Robert Saunders, hereby declare under penalty of perjury:

1. I am President of Rubicon US REIT, Inc. ("Rubicon"), a corporation organized under the laws of Delaware, and of its subsidiaries which have filed for protection under chapter 11 (collectively, "Debtors"). I am familiar with Debtors' day-to-day operations, business, and financial affairs, and have worked with Debtors since June 18, 2007.

2. On or about January 20, 2010 (the "Petition Date"), Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"). Debtors continue to operate their business and manage their properties and assets as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3. No trustee or examiner has been appointed in Debtors' chapter 11 cases, and no committees have been appointed or designated.

4. In order to enable Debtors to operate effectively and minimize certain of the potential adverse effects of the commencement of these chapter 11 cases on their business operations, Debtors have requested various types of relief in certain "first day" motions and applications (each, a "First Day Pleading" and collectively, the "First Day Pleadings").

5. I submit this declaration (the "Declaration") in support of the First Day Pleadings. Any capitalized terms not expressly defined herein have the meanings set forth in the relevant First Day Pleading. I am familiar with the contents of each First Day Pleading, and I believe that the relief sought in each First Day Pleading (i) is necessary to enable Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, (ii) constitutes a critical element in achieving a successful reorganization of Debtors, and (iii) is in the best interests of Debtors, their estates and creditors.

6. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, on information supplied to me by other members of Debtors' management team and/or professionals retained by Debtors, on discussions at meetings of the Board of Directors prior to filing, on information learned from my review of relevant documents, or on my opinion based upon my experience and knowledge of Debtors' operations, financial condition and present liquidity needs. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of Debtors.

## Debtors' Business and Operations

7. Rubicon is principally owned by Rubicon America Trust ("RAT"), an Australian business trust.[1] Rubicon, in turn, owns 100% of the membership interests of Rubicon GSA II, LLC ("GSA II"). GSA II owns 100% of the membership interests in the twelve (12) LLC's (the "Property LLC's") who have also filed for chapter 11 protection, each of which owns office buildings (each a "Property" and collectively, the "Properties") located in nine (9) different states and eleven municipalities across the United States, that generally are leased to

---

[1] Approximately .55% of Rubicon is owned by third parties.

single tenants, usually a county, state or federal government agency. The twelve LLC's, each a Debtor herein, are: (i) Rubicon GSA II Alameda, LLC; (ii) Rubicon GSA II Baltimore, LLC; (iii) Rubicon GSA II Beacon Station Miami, LLC; (iv) Rubicon GSA II Boise BLM, LLC; (v) Rubicon GSA II Boise INS, LLC; (vi) Rubicon GSA II Centennial Tacoma, LLC; (vii) Rubicon GSA II Fresno, LLC; (viii) Rubicon GSA II Kansas City, LLC; (ix) Rubicon GSA II New Orleans, LLC; (x) Rubicon GSA II Richmond, LLC; (xi) Rubicon GSA II Duncan Plaza Portland, LLC; and (xii) Rubicon GSA II Santa Clara, LLC.

8. The Properties are managed by third parties, including C.B. Richard Ellis and an affiliate, Manco, Ramco Gershenson Properties Trust, Sierra Property Management and Melvin Mark & Associates ( collectively, the "Property Managers").

**Debtors' Capital Structure, Financial Performance, Liabilities and Assets**

9. Debtors' purchase of the Properties was financed primarily through the assumption of various pre-existing obligations, secured by certain mortgages (the "Mortgages"). The Mortgages have been securitized and are held by various mortgage on behalf of the relevant trust.

10. Generally between the 1st and the 3rd of each month, tenants at each of the Debtors' properties (individually, a "Property," and collectively, the "Properties") submit lease payments in one of the following ways: (i) deposit rents directly into lockboxes specifically designated for each Property; (ii) deposit rents into Property operating accounts (defined below); (iii) send rent payments directly to the loan servicer; or (iv) wire payments into a servicer-controlled account. In most cases, these funds are sufficient to pay the debt service for each Property, including reserves for taxes and other required escrows, which are either paid directly from the accounts into which funds are received or from the Concentration Account (as defined

below). Any excess funds remaining after payment of debt service are deposited into the respective property operating accounts ("Operating Accounts"), established for each Property.

11. Historically, property-level operating expenses (i.e., payments to vendors & service providers) are paid from the Operating Accounts. Excess cash, if any, held in the individual Operating Accounts after payment of operating expenses, is transferred daily into a concentration account (the "Concentration Account") maintained by GSA II. While the funds of the various Debtors are commingled in the Concentration Account, Debtors maintain adequate books and records to determine which Debtor deposited funds in the Concentration Account and for which Debtor expenses were paid. Funds are transferred from the Concentration Account back to the Operating Accounts on an as-needed basis. Periodically, cash in the Concentration Account in excess of the amounts needed for operating expenses is transferred to a money market account held by Rubicon.

12. Rubicon is the obligor under certain unsecured notes (the "Global Senior Notes"), with an aggregate outstanding balance of approximately $81 million. The Global Senior Notes are guaranteed by RAT and its parent, Rubicon Asset Management Limited, an Australian company. In addition, the Global Senior notes are secured by a collateral pledge by GSA II of some of GSA II's equity interest in certain of the Property LLC's.

### Reasons for Filing

13. In 2008, Debtors began experiencing financial difficulties, primarily due to the general downturn in the commercial real estate market. Although historically, rental income from the properties was, for the most part, sufficient to pay all required debt service on the Mortgages and all operating expenses, the excess, if any, transferred to Rubicon by GSA II

was insufficient to pay the debt service on the Global Senior Notes. As a result, Debtors believed that they would be in default under the Senior Global Notes before the end of 2009.

14. Further, the Mortgages on the Properties (the "Dexia Mortgages") owned by Rubicon GSA II Boise BLM, LLC, Rubicon GSA II Boise INS, LLC, Rubicon GSA II Fresno, LLC and Rubicon GSA II Richmond, LLC contained "hyper-amortization" provisions. These provisions are not triggered by any default on the part of the Debtors, but on the passing of a so called "Anticipated Repayment Date." The Anticipated Prepayment Date for the Dexia Mortgages was November 11, 2009. If the Dexia Mortgages were not paid in full by that date, all rents were subject to being "trapped," i.e., used only to pay the Dexia Mortgages, leaving no funds available to pay operating expenses. This will cause severe liquidity problems over time.

15. Other Properties may also become subject to "cash traps" if certain conditions are not met, increasing potential liquidity problems.

16. Debtors realized that owing to the already-existing cash flow problem coupled with the loss of rental income from the Properties subject to the Dexia Mortgages, they would shortly run out of funds. As a result, Debtors' Boards of Directors began exploring solutions for surviving the cash crunch. One possible avenue was to sell the Properties outside of bankruptcy, but, given the status of the Mortgages, the Boards did not believe that this plan was a viable option. Ultimately, the Boards determined that seeking relief under the Bankruptcy Code and either selling the Properties in a competitive process or restructuring the debt in bankruptcy to permit holding the Properties until an upturn in the real estate market, was the best way to maximize recovery for all creditors, including the holders of the Global Senior Notes (the "Bondholders").

## Summary of First Day Pleadings

a. **Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.**

17. Debtors are comprised of fourteen (14) individual Debtors. Many of the motions, applications, notices, orders and other documents filed and entered in these Cases will relate to and affect all Debtors collectively. Using a single consolidated case docket will relieve all parties – including the Court – of the burden and related expense of filing and entering duplicative documents in each of the Cases and monitoring multiple dockets to stay apprised of developments in the Cases and matters before the Court. Debtors will also realize substantial cost savings and reduced administrative burdens by sending a single set of notices to a single creditor matrix and Bankruptcy Rule 2002 list, rather than multiple sets of notices to multiple notice lists. Joint administration will simplify all aspects of the administration of the Cases and result in substantial cost savings to Debtors and other parties in interest.

18. I believe that the relief requested in the motion for joint administration is in the best interests of Debtors' estates and creditors and is both necessary and appropriate to the efficient administration of these cases.

b. **(i) Debtors' Motion for Order Authorizing Debtors to Continue and Maintain Consolidated Cash Management System and Existing Bank Accounts**

**(ii) Debtors' Motion for Order Authorizing Debtors to Continue Using Their Existing Business Forms**

19. Debtors request that the Court enter an order authorizing Debtors to: (i) continue to operate their centralized cash management system (the "Cash Management System") as modified in the proposed Order; (ii) fund their operations; (iii) maintain their existing bank accounts (the "Bank Accounts"); and (iv) continue to use their business forms.

20. In the ordinary course of business, Debtors use their Cash Management System to efficiently collect, transfer, and disburse funds generated by their business operations. Significant disruption of Debtor's Cash Management System, including the permanent closure of their existing bank accounts, would be detrimental to Debtors operations. Nonetheless, Debtors have proposed certain modifications which I believe are sufficient to protect the interests of creditors who assert a security interest in any of the accounts. Further, if Debtors were required to comply with the Office of the United States Trustee's "Operating Guidelines and Financial Reporting Requirements Required in All Cases Under Chapter 11," their operations would be severely harmed by the disruption, confusion, delay, and cost that would most certainly result from the closure of their existing bank accounts, the opening of new accounts, and the immediate printing of new checks with a "Debtors-in Possession" designation on them. Debtors believe that investment of their funds, if any, in either Operating Accounts at Wachovia or JP Morgan Chase or a concentration account held by Wachovia will provide the protection contemplated by section 345(b) of the Bankruptcy Code.

21. The relief requested in these motions is vital to ensuring Debtors' seamless transition into bankruptcy. Authorizing Debtors to maintain their Cash Management System, as modified to protect alleged secured creditors, will avoid many of the possible disruptions and distractions that could divert Debtors' attention from more pressing matters during the initial days of these chapter 11 cases.

22. I believe that the relief requested in the cash management motion is in the best interests of Debtors' estates and creditors and is both necessary and appropriate to the efficient administration of these cases and Debtors' reorganization efforts. Moreover, any use of putative

cash collateral is expressly conditioned on consent or further order of this Court in order to protect creditors.

   c. **Motion of Debtors and Debtors-in-Possession for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105 and 366(a) Prohibiting Utilities from Discontinuing, Altering or Refusing Utility Services, (b) Deeming Utility Providers Adequately Assured of Future Performance and (c) Establishing Procedures for Determining Adequate Assurance of Payment**

23. Debtors seek entry of an interim order, pursuant to sections 105(a) and 366 of the Bankruptcy Code: (i) determining that Debtors' utility companies have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code pending the entry of a final order; (ii) approving Debtors' proposed offer of adequate assurance and procedures governing any additional or different requests for adequate assurance by the utilities companies; (iii) prohibiting the utility companies from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of Debtors' proposed adequate assurance pending entry of a final order; (iv) determining Debtors are not required to provide any additional adequate assurance beyond what is proposed by their motion pending entry of a final order; and (v) scheduling a final hearing on the motion to consider the relief requested.

24. Given that Debtors own and operate twelve (12) Debtor Properties, uninterrupted utility services are essential to Debtors' ongoing operations and the success of Debtors' reorganization. Should any utility company refuse or discontinue service, even for a brief period, tenants at the Properties, many of which are government agencies, may decide not to pay their rent or renew their leases, which could severely disrupt Debtors' business operations. Such disruption would jeopardize Debtors' reorganization efforts. It is essential that the utility services continue uninterrupted during the chapter 11 case.

25. I believe that we have tried to balance the needs of Debtors with the rights of Utilities. In providing a two (2) week deposit for each Utility plus a mechanism for Utilities to object to this program and/or seek further adequate protection while still providing services, we have avoided disruption of Debtors' real estate business while protecting the Utilities. This clearly is in the best interests of the estates and their creditors.

   d. **Debtors' Motion for Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals Pursuant to 11 U.S.C. §§ 105(a) and 331.**

46. Debtors request, pursuant to sections 105(a) and 331 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 2016(a), for entry of an order establishing procedures for the compensation and reimbursement of attorneys and other professionals whose retentions are approved by this Court pursuant to section 327 or 1103 of the Bankruptcy Code on a monthly basis, on terms that satisfy the requirements of Local Bankruptcy Rule 2016-2, will streamline the professional compensation process and enable the Court and all other parties to monitor more effectively the professional fees incurred in these chapter 11 cases.

47. I believe it will be a benefit to Debtors to receive monthly invoices rather than applications once every one-hundred and twenty (120) days. I also do not believe the professionals should finance the chapter 11 if I want to get their best effort throughout.

48. I believe that the authority to enter into the proposed interim compensation procedures for Debtors' professionals is in the best interests of Debtors and their estates and will enable Debtors to continue to operate, and effectively reorganize, their business in chapter 11 without the help of committed professionals.

   e. **Debtors' Motion for an Order (a) Authorizing the Filing of a Consolidated List of the Top 30 Unsecured Creditors, and (b) Extending the Time for Filing Schedules and Statements.**

49. Debtors request, pursuant to section 521 of the Bankruptcy Code, Federal

Rule of Bankruptcy Procedure 1007(c) (as amended) and Local Bankruptcy Rule 1007-1(b), (i) a thirty (30) day extension of time to file their (a) schedules of assets and liabilities, (b) schedules of current income and expenditures, (c) schedules of executory contracts and unexpired leases, and (d) statements of financial affairs, to forty-four (44) days from the Petition Date. Debtors also seek an order allowing them to file a consolidated list of their unsecured creditors.

50. While Debtors are working to assess the options for a long-term solution and to stabilize their businesses, time and resources are strained, particularly because all creditor-related records are held by a non-debtor third-party or at the Properties. Debtors currently have no employees and only three (3) officers (including myself) who work for a non-debtor affiliated management firm. In view of the amount of work entailed in completing the schedules and statement and the competing demands on Debtors' officers and professionals during the initial post-petition period, Debtors likely will not be able to properly and accurately complete their schedules and statements within the time period imposed under the applicable procedural rules. Therefore, Debtors are requesting a total of forty-four (44) days from the Petition Date to file their schedules and statements, which I believe is reasonable under the circumstances.

51. Further, given that Debtors' unsecured creditors may have claims against one or more of the fourteen (14) Debtors, a consolidated list will be both cost effective and of assistance to the U.S. Trustee in identifying those creditors who may want to serve on a committee. If we did a separate list for each Debtor, it would go down to nominal amounts.

52. Accordingly, I respectfully submit that ample cause exists for the requested extension for filings their statements and schedules of financial affairs and to file a consolidated list of unsecured creditors.

## f. Debtors' Application for Order Authorizing Retention of Squire, Sanders & Dempsey, LLP as Attorneys for the Debtors and Debtors-in Possession Pursuant

**to Sections 327, 329 and 1107 of the Bankruptcy Code, *Nunc Pro Tunc* to the Petition Date**

53. Debtors seek to employ and retain SSD as their general counsel and restructuring and bankruptcy counsel, pursuant to section 327(a) of the Bankruptcy Code and *nunc pro tunc* to the Petition Date.

54. SSD is particularly well suited to serve as Debtors' lead restructuring counsel in these Cases. With more than nine-hundred (900) attorneys in thirty (30) offices worldwide, SSD has broad-based practice groups with expertise in virtually all areas of law that may be significant in these Cases, including, for example, bankruptcy and restructuring, corporate finance, real estate and real estate finance. Moreover, SSD possesses nationally-recognized expertise in bankruptcy matters, having been actively involved in major Chapter 11 cases, including real estate bankruptcies.

55. SSD also has obtained a detailed familiarity with Debtors' business, capital structure, and financial affairs through its pre-petition representation of Debtors and of the Voluntary Administrator for Debtors' Australia-based parent, Rubicon America Trust ("RAT"). SSD has worked closely with the Board of Directors on this matter and has earned their confidence. It would be expensive for Debtors to replace SSD's institutional knowledge and very disconcerting to the Boards. Debtors have chosen SSD to serve as general and bankruptcy and restructuring counsel in connection with these Cases, in light of SSD's extensive expertise in large chapter 11 reorganizations, coupled with its real estate expertise.

56. I believe SSD has the necessary background to deal effectively with the full range of potential legal issues and problems that may arise in the context of these Cases, and that it would be harmful to Debtors to change counsel at this point.

g. **Debtors' Application for Order Authorizing Retention of Phillips, Goldman & Spence, P.A. as Delaware Bankruptcy Counsel Pursuant to Sections 327, 329 and 1107 of the Bankruptcy Code, *Nunc Pro Tunc* to the Petition Date**

57. Debtors seek to retain Phillips, Goldman & Spence, P.A. ("PG&S") as their Delaware bankruptcy counsel, pursuant to section 327(a) of the Bankruptcy Code and *nunc pro tunc* to the Petition Date.

58. I believe that the firm's extensive experience, expertise and knowledge in the Bankruptcy Court for the District of Delaware, and its experience working together with lawyers at SSD, makes it eminently qualified to act as Delaware co-counsel for Debtors.

59. I believe PG&S has the necessary background to deal effectively with the full range of potential legal issues and problems that may arise in the context of these Cases. Also, as a smaller firm, it has very few conflicts and can step in if and when SSD cannot act.

h. **Debtors' Application for Order Authorizing Retention of the Garden City Group, Inc. as Noticing, Claims and Balloting Agent and Approving Related Agreement**

60. Debtors seek to retain the Garden City Group, Inc. ("GCG") as their noticing, claims, and balloting agent ("Claims Agent"). GCG came highly recommended by both Debtors' lawyers and financial advisors. Based on GCG's considerable experience in providing similar services in large chapter 11 cases, I believe that the retention of GCG as Claims Agent is in the best interests of Debtors, their estates and their creditors. Furthermore, I have been advised that Debtors are required by Local Rule to have a claims agent, and I want Debtors to be in compliance with such rule.

i. **Debtors' Application for Order Authorizing Retention of Grant Thornton LLP as Financial and Restructuring Advisors to Debtors, *Nunc Pro Tunc* to the Petition Date**

61. Debtors seek to retain Grant Thornton LLP ("GT") as financial and

restructuring advisors to Debtors *nunc pro tunc* to the Petition Date.

62. Partners of Grant Thornton Australia have been appointed as Joint and Several Voluntary Administrators ("Administrators") of Rubicon Asset Management Limited ("RAML"), an Australian entity that is the responsible entity for Rubicon America Trust (an Australian Listed Property Trust) which holds a 99.45% interest in Rubicon US REIT, Inc.

63. Prior to the filing of these Cases, GT provided services to Grant Thornton Australia in connection with its review of the international operations, assets and liabilities of the Rubicon Group. By virtue of this prior engagement, GT is familiar with the books, records, financial information in relation to these chapter 11 cases. Since Debtors have no employees, GT has been providing most of Debtors' accounting, financial analysis and financial projections for some time. It would be a huge blow to Debtors if they were forced to replace all of GT's services and institutional knowledge, not to mention extremely expensive. GT has considerable experience with rendering such services to debtors and other parties in interest in numerous chapter 11 cases.

64. As such, I believe that GT is well qualified to perform the work required in these cases, and that their continued representation is the most cost effective avenue, as well as the least disruptive.

[The balance of this page intentionally left blank]

I declare under penalty of perjury that this Declaration is true and correct.

_____
Robert Saunders
President, Rubicon US REIT, Inc. and its Subsidiaries

NEWYORK/123933.4