IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RUBICON US REIT, INC. et al., | ) | Case No. 10-10160 (BLS) |
| | ) | Jointly Administered |
| Debtors. | ) | Hearing Date: 1/26/2010 @ 1:30 p.m. |
| | ) | Obj. Deadline: 1/26/2010 @ 1:30 p.m. |

## MOTION OF DEBTORS FOR ORDER AUTHORIZING DEBTORS TO ASSUME EXCLUSIVE NEGOTIATING RIGHTS AGREEMENT AND GRANTING RELATED RELIEF

Rubicon US REIT, Inc. ("Rubicon"), and its affiliated debtors (each a "Debtor" and collectively, "Debtors"),[1] debtors and debtors-in-possession in the above-captioned cases ("Cases"), hereby file this "Motion of Debtors for Order Authorizing Debtors to Assume Exclusive Negotiating Rights Agreement and Granting Related Relief" (the "Motion"); and in support thereof, respectfully state as follows:

### JURISDICTION AND VENUE

1. The Court has jurisdiction over these Cases pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Rubicon is a corporation organized under the laws of the State of Delaware; the remaining Debtors are limited liability companies organized under the laws of the State of Delaware. Accordingly, venue of all of Debtors' chapter 11 cases and proceedings is proper in this District under 28 U.S.C. §§ 1408 and 1409.

---

[1] Debtors in these Cases, along with the last four digits of each Debtor's federal tax identification number, are: Rubicon US REIT, Inc. (3829); Rubicon GSA II, LLC (1728); Rubicon GSA II Alameda, LLC (3031); Rubicon GSA II Baltimore, LLC (8907); Rubicon GSA II Beacon Station Miami, LLC (4746); Rubicon GSA II Boise BLM, LLC (6547); Rubicon GSA II Boise INS, LLC (3007); Rubicon GSA II Centennial Tacoma, LLC (9395); Rubicon GSA II Fresno, LLC (2062); Rubicon GSA II Kansas City, LLC (9685); Rubicon GSA II New Orleans, LLC (8365); Rubicon GSA II Richmond, LLC (5612); Rubicon GSA II Duncan Plaza Portland, LLC (9256); Rubicon GSA II Santa Clara, LLC (5547).

3. The predicate for the relief requested herein are sections 105(a) and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 6006 and Local Bankruptcy Rule 9013-1(m).

## BACKGROUND

### General Background

4. On January 20, 2010 (the "Petition Date"), Debtors commenced their respective reorganization Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code, in the above-captioned bankruptcy court (the "Court"). The factual support for this Motion can be found in the Declaration of Robert Saunders in Support of First Day Orders filed simultaneously with the Petitions and First Day Orders (the "Saunders Affidavit").

5. Debtors are continuing in possession of their respective properties and are operating and managing their businesses as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

6. Certain Debtors[2] own office buildings (collectively, the "Properties") located in nine different states and eleven municipalities across the United States. These are typically leased to single tenants, usually a county, state or federal government agency.

### Background Regarding the Exclusivity Agreement

7. Rubicon is almost entirely owned by Rubicon America Trust ("RAT"), an Australian business trust, which itself is owned by Rubicon Asset Management, Ltd. ("RAML").

8. In or about August 2009, RAML was placed into liquidation under the laws of Australia, and voluntary administrators were appointed. By order of the Australian insolvency

---

[2] Rubicon US REIT, Inc. and Rubicon GSA II, LLC are holding companies and do not directly own any real property. See fn. 1.

2

court, RAML was ordered to liquidate its assets, including its interests in the U.S. entities. In an effort to comply with its mandate, RAML asked Rubicon to begin investigating possible options for disposal of its U.S. assets. In any event, the Debtors were facing a liquidity crisis which required a solution as set forth more fully in the Saunders Affidavit. One option was to try and sell the Properties in the open market. The financial crisis and the unavailability of financing, however, made this option unattractive. Another option was to place Rubicon and its U.S. subsidiaries into bankruptcy and sell the Properties through a bankruptcy process. Rubicon felt bankruptcy would be a more attractive alternative if it could negotiate a stalking-horse offer to launch the sale process.

9. In late October 2009, Global Asset Capital, LLC ("GAC") contacted Rubicon to inquire whether Rubicon would entertain a stalking-horse bid for a sale in chapter 11. GAC had had previous conversations with the RAML Voluntary Administrators about an out-of-court purchase. Rubicon indicated to GAC that it believed a stalking-horse would make chapter 11 the most viable option of the options it was considering. Rubicon thereupon began negotiations with GAC to act as "stalking horse" in the event Rubicon filed for bankruptcy relief.

10. The Parties negotiated a process that would require a bankruptcy filing and the sale of the Properties to GAC or another successful bidder through confirmation of a plan of reorganization as the method to maximize value of the estate. The details of that agreement were left for a plan support agreement (the "PSA") to be negotiated in the future.

11. On or about November 4, 2009, Rubicon and GAC entered into a letter of intent (the "LOI"), pursuant to which the parties agreed that Rubicon would negotiate a PSA and seek Bankruptcy Court approval of same. Rubicon asserts that the LOI provided that if Rubicon did not execute the PSA and did not file for bankruptcy relief by November 10, 2009, the LOI would

3

automatically expire, and Rubicon would owe GAC counsel fees. As Rubicon soon found out, GAC disputed this interpretation.

12. Subsequent to November 4, 2009, but prior to November 10, 2009, Rubicon reached an agreement with the holders of its Global Senior Notes (the "Noteholders") to provide some interim liquidity to Rubicon. As a result, the Debtors' Board of Directors, in the exercise of their fiduciary duties, elected not to file for relief under the Bankruptcy Code by November 10. As a result, Debtors believed that the LOI had terminated by its terms as of midnight November 10, 2009.

13. On or about November 13, 2009, GAC commenced litigation in the Delaware Chancery Court (the "Chancery Court") in a case captioned *Global Asset Capital, LLC v. Rubicon U.S. REIT, Inc.*, Case Number C.A. 5071 (the "Chancery Litigation") and filed a Motion for Temporary Restraining Order ("TRO"): (i) preventing Rubicon from disclosing the terms of the LOI; (ii) preventing Rubicon from soliciting or entertaining any third-party offers involving any of the Properties; and (iii) mandating that Rubicon negotiate the PSA immediately and in good faith. GAC took the position that the LOI continues in existence despite Debtors' failure to file bankruptcy by November 10, including, *inter alia*, the exclusive negotiating provisions of the LOI.

14. On November 17, 2009, the Chancery Court granted the TRO, which temporarily enjoined Rubicon from: (i) disclosing any of the contents of the LOI without prior written consent of GAC; (ii) soliciting or entertaining any third-party offers involving any of the Properties set forth in the LOI for the duration of the LOI; and (iii) asserting that the LOI had terminated pursuant to the termination provisions set forth in the LOI which provided that if Rubicon filed a bankruptcy petition without an executed PSA, the LOI automatically terminated.

Without the resolution embodied in the Exclusivity Agreement (as defined below) or further orders of the Chancery Court, the Debtors were enjoined from marketing their Properties.

15. Following entry of the TRO, the parties agreed to stay the Chancery Litigation in an effort to reach an agreement that would address the claims of GAC and Debtors' concerns relating to an effective chapter 11 reorganization process. The result of those negotiations is the Exclusive Negotiating Rights Agreement which is the subject of this Motion (the "Exclusivity Agreement") entered into between Debtors, on the one hand, and GAC on the other (the "Parties"), a true and correct copy of which is attached hereto as Exhibit 1. Debtors assert that the Exclusivity Agreement is in the best interests of their estates and their creditors because: (i) it resolves the Chancery Court litigation and potential claims thereunder, which could have been as high as $12 million; (ii) it provides for an orderly Chapter 11 filing with a clean path to an exit strategy; and (iii) it provides all parties-in-interest an opportunity to be heard on whatever path Debtors select.

**Terms of the Exclusivity Agreement[3]**

> **A** **Exclusive Negotiation Period and Prohibited Actions.** Debtors agree that, without the prior written consent of GAC, during a period (the "Exclusive Negotiation Period") beginning on the date this Motion is filed and ending forty-five (45) calendar days later, Debtors shall not: (a) initiate, assist, solicit, negotiate, encourage, accept or otherwise pursue any offer or inquiry from any person or entity (i) to engage in any acquisition of the Properties, (ii) to reach any agreement or understanding for an acquisition of the Properties; or (b) engage in any sales or marketing discussions or distribute or make available any diligence or

---

[3] The following presents a summary of the Exclusivity Agreement. The Exclusivity Agreement should be reviewed in its entirety. Any discrepancy between the description of the Exclusivity Agreement in this Motion and the Exclusivity Agreement shall be resolved in favor of the Exclusivity Agreement.

5

Property-related information in connection with any sale or marketing efforts of the Properties or otherwise take any steps to sell or market the Properties (the foregoing constituting the "Prohibited Actions"). Debtors may, however, during this time, engage real estate professionals to develop a marketing campaign.

**B** **Term Sheet and Definitive Documentation.** During the Exclusive Negotiation Period, the Parties shall use their best efforts to agree on Definitive Documentation for the acquisition of the Properties in accordance with a term sheet (the "Term Sheet"), which is attached to the Exclusivity Agreement as Exhibit A. There is no guarantee that an agreement on Definitive Documentation will be reached. The Term Sheet is non-binding and sets forth the following general terms:

> Purchase Price: An amount satisfactory to the Debtors and GAC based upon the number of Properties purchased and the sale method, with property reserves being transferred to GAC and existing debt being assumed. The purchase price may be subject to a 2% price adjustment based upon certain diligence results.
>
> Sale Method: Either sale under section 363 of the Bankruptcy Code or a sale pursuant to a chapter 11 plan (or plans) of reorganization, or a combination of both methods, as determined by the Parties, which will in all events involve a marketing and auction process approved by the Bankruptcy Court.
>
> Bidding Protections: 2.7% breakup fee (only 75% of which will be payable in the event that GAC enters into competitive bidding), plus expense reimbursement capped at $1.5 million (which may include litigation costs and will be fully payable in the event that GAC enters into competitive bidding).
>
> Diligence Period: GAC shall have not less than a thirty (30) day diligence period commencing after the approval of the sale and bidding procedures by the Bankruptcy Court.
>
> Loan Assumption: Existing loans with respect to the Properties will be modified in an acceptable manner (including specifically to address

maturity defaults, hyper-amortization and penalty interest) and assumed by GAC. No transfer or assumption fee shall be payable by GAC in connection with such assumption.

C. **Bankruptcy Court Filings.** The Exclusivity Agreement requires Debtors to file this Motion within two (2) business days of the Petition Date and to diligently pursue Court approval on an expedited basis.

D. **Chancery Litigation Dismissal.** Upon execution of the Exclusivity Agreement, the Chancery Litigation was dismissed *without prejudice*. The dismissal order entered by the Chancery Court on January 21, 2010, provides that if this Exclusivity Agreement is approved by a Bankruptcy Court order ("the Exclusive Negotiation Order"), when the Exclusive Negotiation Order becomes a final, non-appealable order, the Chancery Court dismissal is deemed *with prejudice*. Thus, the Debtors only get the full benefit of the Exclusivity Agreement if its assumption is approved by this Court.

E. **Expense Reimbursement.** If, by the end of the Exclusive Negotiation Period or any mutual extensions thereof, GAC or Debtors have not executed Definitive Documentation, then Debtors shall reimburse GAC for its reasonable attorneys' fees incurred in connection with the LOI, the Exclusivity Agreement and the Definitive Documentation, but not any litigation fees or expenses, which amounts cannot exceed $288,610 for the period from inception through December 31, 2009.

F. **Buyer's Deposit.** The Buyer has deposited $1 million with its counsel as evidence of good faith. If and when the Exclusive Negotiation Order becomes a final order, so long as the Exclusive Negotiation Period has not expired, Buyer

will deposit an additional $1.25 million with its counsel. The deposits will be returned to Buyer if no Definitive Documentation is executed by the end of the Exclusive Negotiation Period, as such period may be extended from time to time. If Definitive Documentation is approved by this Court, Buyer shall deposit $3 million in escrow for the benefit of the Debtors pursuant to an escrow agreement embodied in the Definitive Documentation, such $3 million consisting of the $2.25 million held by Buyer's counsel and an additional deposit of $750,000. If this Court declines to approve the Definitive Documentation, then Buyer's counsel shall return the $2.25 million it is holding to Buyer.

### RELIEF REQUESTED AND BASIS FOR RELIEF

16. Section 365(a) provides that a debtor, subject to the Court's approval, may assume or reject any executory contract or unexpired lease of the debtor. 11 U.S.C. § 365(a). A decision to assume or reject a contract under section 365 must be based on the debtor's business judgment. *See Computer Sales Int'l, Inc. v. Fed. Mogul Global, Inc. (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 127 (D. Del. 2003) (section 365(a) "'grants a debtor in possession the fundamental authority to assume or reject an executory contract as a vital part of the bankruptcy process'") (quoting *In re Trans World Airlines, Inc.*, 261 B.R. 103, 123 (Bankr. D. Del. 2001)).

17. Under the business judgment test, a court should approve a debtor's proposed assumption if it will benefit the estate. *Id.* A debtor's decision to assume or reject an executory contract should be accepted unless evidence is presented that the decision was the product of "'bad faith, or whim or caprice.'" *In re TWA*, 261 B.R. at 121 (quoting *Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 849-50 (Bankr. W.D. Pa. 1987)).

18. In this case, Debtors have properly exercised their business judgment in seeking assumption of the Exclusivity Agreement. Assumption of the Exclusivity Agreement provides Debtors with three substantial benefits. First, it lays the groundwork for the formation of a stalking horse bid by GAC to acquire all of Debtors assets and the expedient resolution of these Cases. Second, assumption of the Exclusivity Agreement by final order results in the immediate dismissal, with prejudice, of the Chancery Litigation which has been a costly distraction from the task of reorganizing Debtors, and this, in turn, eliminates a potential $12 million (or more) in claims against Rubicon. Third, implementation of the Exclusivity Agreement will also offer Debtors an opportunity to explore the best means through which to liquidate the Properties – whether through a sale under section 363(b) of the Bankruptcy Code or the confirmation of a plan or plans of reorganization – while providing the protection of the Bankruptcy Code that Debtors need. It offers creditors an early opportunity to be heard on Debtors' exit strategy, as any Definitive Documentation will come before this Court for approval.

## SATISFACTION OF BANKRUPTCY RULE 6003(c)

19. Bankruptcy Rule 6003(c) provides, *inter alia*, that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "assume or assign an executory contract ... in accordance with § 365" prior to twenty-one (21) days after the Petition Date. Here, in order to ensure that the Exclusive Negotiation Period commences and runs as quickly as possible so as to avoid needlessly prolonging these Cases, Debtors request entry of an interim order (the "Exclusivity Order") granting this Motion prior to expiration of the twenty-one (21) day period following the Petition Date. *See In re First NLC Fin. Servs., LLC*, Case No. 08-10632-BKC-PGH, 2008 Bankr. LEXIS 1466 at *5 (Bankr. S.D. Fla. Jan. 28, 2008) ("nothing in the text of Rule 6003 precludes entry of an interim order"). In order to ensure due

process, the Exclusivity Order shall provide that any party in interest, including any statutory committee appointed by the U.S. Trustee, shall have fifteen (15) days from entry of the Exclusivity Order to file an objection to the entry of a Final Order with the Court.

20. Absent entry of the Exclusivity Order, Debtors' negotiations with GAC could be delayed and, should those negotiations fail, that delay would hinder Debtors' efforts to find an alternative buyer or to implement an alternative strategy for the reorganization of the Properties. Furthermore, Debtors would be in a no man's land filled with uncertainty as to whether they can negotiate with third parties or solely GAC in the period prior to assumption if an interim order is not entered. If unsolicited offers come in before this matter can be heard, Debtors would be forced to choose between negotiating potentially valid offers and risking claims of further damages from GAC. It could even risk losing GAC as a potential stalking horse if GAC perceives Rubicon is not acting in good faith; yet it may have a duty to respond to third parties if this agreement is not in place. It is therefore in the interests of all parties to limit Debtors' exposure by immediately defining the Parties' obligations through interim assumption of this Exclusivity Agreement. There are no actions which Debtors would be forced to take prior to a Final Hearing which would irrevocably effect any other creditors' rights. As a result, Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to Debtors and, therefore, Bankruptcy Rule 6003(c) has been satisfied.

## INAPPLICABILITY OF RULE 6006(d)

21. Bankruptcy Rule 6006(d) provides that an order authorizing the assignment of a contract under section 365(a) of the Bankruptcy Code is stayed for fourteen (14) days following the entry of such order. Debtors submit that because the Exclusivity Agreement is not being

assigned, Bankruptcy Rule 6006(d) is inapplicable and request that the Interim Order and any Final Order find as such.

## NOTICE

22. Notice of this Motion has been served on: (i) the Office of the United States Trustee for the District of Delaware; (ii) Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) counsel for GAC; (iv) all parties that have requested special notice pursuant to Bankruptcy Rule 2002; (v) Wilmington Trust as Indenture Trustee to the Noteholders; and (vi) counsel to an *ad hoc* committee of the Noteholders. Notice of the Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested, Debtors respectfully submit that no further notice of this Motion is required.

## NO PREVIOUS REQUEST

23. No previous request for the relief sought herein has been made by Debtors to this or any other court.

[The balance of this page intentionally left blank]

WHEREFORE, Debtors respectfully request (a) entry of Interim and Final Orders authorizing Debtors to assume the Exclusivity Agreement, and (b) any other related relief this Court deems appropriate.

Dated: Wilmington, Delaware
      January 22, 2010

Respectfully submitted,

PHILLIPS, GOLDMAN & SPENCE, P.A.

/s/ Stephen W. Spence
Stephen W. Spence (Bar No. 2033)
1200 N. Broom St.
Wilmington, DE 19806
Telephone (302) 655-4200
Facsimile (302) 655-4210
Email: sws@pgslaw.com

-and-

SQUIRE SANDERS & DEMPSEY, LLP
Sandra E. Mayerson (pro hac vice requested)
Peter A. Zisser (pro hac vice requested)
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 872-9800
Facsimile: (212) 872-9815
smayerson@ssd.com
pzisser@ssd.com

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION