## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RUBICON US REIT, INC., et al., | ) | Case No. 10-10160 (BLS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Hearing Date: February 22, 2010 at 9:30 a.m.** |
| | ) | **Objection Deadline: February 12, 2010 at 4:00 p.m.** |

## MOTION OF RUBICON NOTEHOLDERS PURSUANT
## TO SECTION 1121(d)(1) OF THE BANKRUPTCY CODE FOR
## ENTRY OF AN ORDER TERMINATING EXCLUSIVE PERIODS
## FOR DEBTORS TO PROPOSE AND SOLICIT ACCEPTANCES OF A PLAN

The Rubicon Noteholders[1] hereby submit this motion (the "**Motion**") pursuant to section 1121(d)(1) of title 11 of the United States Code (the "**Bankruptcy Code**") for entry of an order terminating the exclusive periods for Rubicon US REIT, Inc. ("**Rubicon**") and its debtor subsidiaries (each, a "**Debtor**" and collectively, the "**Debtors**"),[2] debtors and debtors in possession in the above-captioned cases to propose and solicit acceptances of a plan (together, the "**Exclusive Periods**"). In support of the Motion, the Rubicon Noteholders respectfully state as follows:

---

[1] The holders of 100% of the Global Senior Notes (collectively, the "**Rubicon Noteholders**") are Debt II RB, L.P. and Debt-V RB, L.P. (affiliates of Starwood Capital Group Global, L.L.C), KJ Mandrake LLC (an affiliate of Kaufman Jacobs LLC), JPMorgan Chase Funding Inc., and N-Star Real Estate CDO IX, Ltd.

[2] The Debtors in these cases, with the last four digits of their federal tax identification numbers, are: Rubicon US REIT, Inc. (3829); Rubicon GSA II, LLC (1728); Rubicon GSA II Alameda, LLC (3031); Rubicon GSA II Baltimore, LLC (8907); Rubicon GSA II Beacon Station Miami, LLC (4746); Rubicon GSA II Boise BLM, LLC (6547); Rubicon GSA II Boise INS, LLC (3007); Rubicon GSA II Centennial Tacoma, LLC (9395); Rubicon GSA II Fresno, LLC (2062); Rubicon GSA II Kansas City, LLC (9685); Rubicon GSA II New Orleans, LLC (8365); Rubicon GSA II Richmond, LLC (5612); Rubicon GSA II Duncan Plaza Portland, LLC (9256); Rubicon GSA II Santa Clara, LLC (5547).

## PRELIMINARY STATEMENT[3]

1.       Although it is unusual to seek termination of the Debtors' exclusivity only three weeks after the Petition Date, the circumstances of these chapter 11 cases are truly extraordinary – if not unique – and cry out for immediate relief.  These chapter 11 cases are only technically voluntary – in reality, the Debtors were forced to file for bankruptcy as a result of a series of disastrous errors committed by their directors and their attorney.  **[REDACTED]**[4] Rubicon executed an ill-advised, lopsided, and poorly drafted LOI that neither the Debtors' directors nor the Debtors' attorney understood.[5]  **[REDACTED]**[6]  **[REDACTED]**[7] These irresponsible and ill-advised actions put Rubicon and the other Debtors on a disastrous and value-diminishing course that led to the filing of these chapter 11 cases.

2.       As a result of entering into the ill-advised LOI and its subsequent breaches, Rubicon found itself a defendant in the Chancery Court Litigation and the subject of the TRO which enjoined Rubicon from: (i) disclosing any of the contents of the LOI without prior written consent of GAC; (ii) soliciting or entertaining any third party offers involving any of the Sale Properties set forth in the LOI for the duration of the LOI; and (iii) asserting that the LOI had terminated pursuant to the termination provisions set forth therein.  *See* Temporary Restraining Order of Rubicon US REIT, Inc. at 1-2 (Del. Ch. Nov. 17, 2009) (the "**TRO**") (attached hereto as Exhibit C).

---

[3]       Capitalized terms used in the Preliminary Statement that are otherwise undefined shall have the meaning ascribed to such terms below.

[4]       [REDACTED].

[5]       Among other things, the Debtors believed, apparently on advice of counsel, that the LOI was non-binding, that the Debtors' had an implicit or inherent "fiduciary-out," and that the LOI terminated automatically on November 10, 2010 if the Debtors did not file bankruptcy by that date.  The Chancery Court reached contrary conclusions on all these issues.  *See* Transcript of November 16, 2009 Hearing at 86:22-93:21 (attached hereto as Exhibit B) (hereinafter, the "**Chancery Tr.**").

[6]       [REDACTED]

[7]       [REDACTED]

3. With the TRO in effect, Rubicon faced a dilemma: (i) remain out of bankruptcy to be embroiled in costly litigation with GAC while the terms of the TRO enjoined Rubicon from, *inter alia*, entertaining any alternative proposals for an out-of-court sales process or a workout, which would maximize the value of the enterprise; or (ii) negotiate a stalking horse agreement and settlement with GAC that would require a chapter 11 filing[8] which would not be in the best interests of the enterprise **[REDACTED]**[9]

As litigating with GAC outside of bankruptcy would be costly and potentially catastrophic both in terms of damages and the inability of the company to conduct a sale process that would maximize value or even enter into workout discussions with the Rubicon Noteholders, **[REDACTED]**

4. Following entry of the TRO, without any negotiating leverage, Rubicon entered into settlement discussions with GAC, resulting in the execution of the Exclusive Negotiating Rights Agreement (the **"Exclusivity Agreement"**) (attached hereto as Exhibit E), executed not only by Rubicon (the sole Debtor signatory of the LOI) but also by all the solvent property-owning Debtors. Among other things, the Exclusivity Agreement (i) requires the Debtors to file chapter 11 cases by January 20, 2010; (ii) requires the Debtors to use their best efforts to negotiate a stalking horse agreement for the Sale Properties in accordance with onerous terms contained in an attached term sheet; and (iii) provides a 52 day[10] **"Exclusive Negotiation**

---

[8] Although a third option may have been a bankruptcy filing without an agreement with GAC, on information and belief, the Debtors never seriously considered that possibility.

[9] **[REDACTED]**

[10] Section 1.1 of the Exclusivity Agreement provides that the GAC exclusivity period commences on the date of execution (January 15, 2010) and terminates 45 days after the "Assumption Filing Deadline," which is defined as two business days after the Petition Date January 20, 2010). Hence the "45" day GAC exclusive period is actually 52 days.

REDACTED VERSION

Period" during which the Debtors are prohibited from entertaining any other sale or restructuring proposals.[11]

5.     In accordance with the terms of the Exclusivity Agreement, on January 20, 2010, the Debtors filed their chapter 11 cases. Unfortunately, in a misguided and transparent effort to cover up the prior errors that caused the filings, the Debtors, **[REDACTED]**, determined to mislead the Bankruptcy Court by filing first day pleadings and the Saunders Declaration that omitted any mention whatsoever of GAC, the LOI, the Chancery Litigation, the TRO, the Exclusivity Agreement, or the Exclusivity Motion. To avoid disclosing to the Court the Debtors' serious missteps and breaches of fiduciary duties, the Saunders Declaration attributes the filing to (i) cash flow problems that, in fact, had already been addressed by liquidity provided by the Rubicon Noteholders and (ii) the "hyper-amortization" of four mortgages, which, in fact, remain easily serviceable and do not require restructuring. There was no mention whatsoever in the Saunders Declaration of the disastrous situation caused by the ill-conceived LOI , its subsequent breach by Rubicon, or the events that followed.

6.     Since Rubicon's financial problems began, the Rubicon Noteholders unanimously opposed the filing of bankruptcy cases by Rubicon and its subsidiaries. The Rubicon Noteholders did not consider a chapter 11 filing to be a viable option because (i) all the mortgages generate sufficient cash to service their debt and pay local operating expenses; (ii) collectively the mortgages generate sufficient free cash to pay Rubicon's operating expenses, (iii) a bankruptcy would be expensive and destroy value, and (iv) the fire sale liquidation value realized in bankruptcy would be less than the going-concern value that the company could obtain in an out-of-court sales process. In that regard, the Rubicon Noteholders did not enforce their

---

[11]     The Exclusivity Agreement expressly prohibits the Debtors from soliciting, negotiating, or pursuing any transaction(s) contemplating an ownership change of any of the Debtors, including Rubicon.

NY 240,068,186v3 2-8-10

remedies after the Notes went into default in September 2009[12] and consistently provided the company with the liquidity it required. As of the Petition Date, all the mortgages were being serviced, and all the Debtors' creditors were being paid in the ordinary course. For months prior to the execution of the LOI by Rubicon, the Rubicon Noteholders encouraged and requested that the Debtors conduct a fair and open out-of-court sale process to realize maximum value for the enterprise.

7. To preserve the Debtors' going concern value, the Rubicon Noteholders are prepared to file a plan of reorganization with the following terms: **[REDACTED]**.

8. As a result of their serious errors and missteps, the Debtors are bound by the Exclusivity Agreement which prohibits the Debtors from even *discussing* the Noteholder Plan without exposing the Debtors to potential claims from GAC. Although the Debtors may have agreed to negotiate exclusively with GAC for 52 days, the Rubicon Noteholders never entered into such an agreement and are not bound by the Debtors' agreement. The Rubicon Noteholders, the only creditor class with an economic stake in the outcome of these cases, should not be forced to stand still while the estates' assets are diminished by unnecessarily languishing in bankruptcy simply because the Debtors' hands are tied as result of the Debtors' errors and breaches, all of which occurred without the knowledge or approval of the Rubicon Noteholders. Accordingly, the Court should terminate immediately the Debtors' Exclusive Periods to permit the Rubicon Noteholders to file their proposed plan of reorganization as soon as possible, permitting a quick exit from these chapter 11 cases, **[REDACTED]**.

---

[12] The default was triggered by Grant Thornton's application to the Australian court requesting liquidation of Rubicon's parent.

## BACKGROUND

### The Debtors

9.        There are fourteen Debtors. Rubicon is a Delaware real estate investment trust that owns 100% of Debtor Rubicon GSA II, LLC ("**Rubicon GSA**"). Rubicon GSA owns the other twelve Debtors (the "**GSA II Debtors**"), each of which owns a single property with an office building[13] (collectively, the "**Sale Properties**"), and each of which is leased to a single tenant[14] that in almost every case is a state or federal government agency or entity. Each property is managed by a local property management company. Although the value of the Sale Properties has declined significantly as a result of the global financial crisis, they remain valuable assets with significant potential for appreciation if properly managed. The Sale Properties are Rubicon's crown jewels.

10.        In addition to the Sale Properties, Rubicon owns 100% of non-Debtor Rubicon Overtown II, LLC ("**Rubicon Overtown**"), which owns a Miami office building (the "**Overtown Property**"). Rubicon also holds 80% interests (the "**JV Interests**") in three non-Debtor joint ventures (the "**JV Companies**"), which collectively own five properties (the "**JV Properties**" and collectively with the Overtown Property, the **Other Properties**"). Unlike the Sale Properties included in the proposed Exclusivity Agreement, the JV Properties, which are conventional, suburban office space, are unattractive to investors in the current real estate market. In addition, the JV Properties are extremely highly leveraged. As a result, the only potential purchasers at this time are Rubicon's joint-venture partners, and a sale of the JV Interests at this time and in this market is expected to yield less than $500,000 in total net

---

[13]        One of the properties has two buildings; some have other structures such as detached garages and vehicle maintenance facilities.

[14]        On information and belief, one of the properties has a tenant that occupies approximately 97% of the building.

proceeds to Rubicon. Overtown is under an option to purchase to the tenant (Miami Dade County) that is expected to yield to Rubicon an amount somewhat less than $2,000,000. The option period runs for 300 days from the date the Certificate of Occupancy is obtained. Neither the JV Interests nor the Overtown Property are included among the assets GAC is seeking to acquire. None of the JV Companies or Rubicon Overtown filed bankruptcy cases.

## The Rubicon Noteholders

11.     The Rubicon Noteholders own 100% of the Global Senior Notes with an aggregate principal balance of $81,132,269. The claims of the Rubicon Noteholders are partially secured by certain Rubicon bank accounts and pledges of Rubicon GSA's equity interests in certain of the Other Debtors. The cash in those bank accounts constitutes cash collateral of the Rubicon Noteholders. The Rubicon Noteholders are the only creditor class with any significant economic stake in the outcome of these chapter 11 cases.[15]

12.     Other than the Rubicon Noteholders, the Debtors have no unsecured creditors with large claims. In fact, after the Global Senior Notes, the next largest unsecured claim is less than $19,000. *See* Amended Consolidated List of 30 Largest Unsecured Creditors [Docket No. 3].[16] Most of these claims are against the twelve property-owning Debtors (the "**GSA II Entities**"), all of which are solvent. Prior to the Petition Date, each of the Sale Properties (including any subject to hyper-amortization) generated sufficient cash to service its mortgage debt and pay all of its operating expenses. Collectively, the Sale Properties generate sufficient free cash to pay Rubicon's operating expenses. Prior to the Petition Date, each of the Debtors was paying its obligations as they came due in the ordinary course.

---

[15]     **[REDACTED]**

[16]     A review of the Debtors' disclosures suggests that unsecured claims against the Debtors (other than the Rubicon Notes) are likely less than $500,000 in the aggregate.

**Prepetition Events Leading to the Bankruptcy Filing**

13.     On or about October 27, 2009, [**REDACTED**],[17] and without ever having raised the possibility of a bankruptcy filing or bankruptcy sale with the Rubicon Noteholders, the attorney for Rubicon approached GAC suggesting GAC be the stalking horse bidder in a 363 sale of the Sale Properties.[18]   On or about November 4, 2009, in breach of its directors' fiduciary duties, without consulting the Rubicon Noteholders or taking into account the interests of the Rubicon Noteholders, the Debtors' other creditors, or the interests of the enterprise,[19] Rubicon entered into a secret letter of intent (the "**LOI**") with GAC, pursuant to which Rubicon agreed that Rubicon and the other Debtors would file chapter 11 cases on or before November 10, 2009, and that GAC would act as a stalking horse bidder for the sale in bankruptcy of the Sale Properties.  LOI ¶¶ 1, 2 & 11 (attached hereto as Exhibit F).  The LOI also required Rubicon to negotiate and enter into a plan support agreement ("**PSA**") on or before November 9, 2009.  LOI ¶ 3.

14.     Although the LOI did not so provide, Rubicon and its attorney believed that the LOI (i) was non-binding,[20] (ii) included a "fiduciary out,"[21] and (iii) terminated on November 10, 2009 if the Debtors did not file bankruptcy by that date.[22]   The LOI contained an onerous

---

[17]     [**REDACTED**]

[18]     *See* Chancery Tr. 10:19-22. Although Ms. Mayerson contends that GAC approached her, that contention is self-serving and lacks credibility because the issue was of no import to GAC's case in the Chancery Court. *See* Chancery Tr. 10:23-24 - 11:1-4.

[19]     Under Delaware law, as established by *Credit Lyonnais Bank Nederland N.V. v. Pathe Communications Corp.* and its progeny, a board of directors of a company operating in the vicinity of insolvency must consider the interests of its creditors in addition to those of stockholders. Civ. A. No. 12150, 1991 WL 277613, at *34 (Del. Ch. Dec. 30, 1991). The directors must "exercise judgment in an informed, good faith effort to maximize the corporation's long-term wealth creating capacity." *Id.* Moreover, the directors must "choose a course of action that best serves the entire corporate enterprise rather than any single group interested in the corporation." *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 789 (Del. Ch. 1992).

[20]     Chancery Tr. 55:4-10; [**REDACTED**].

[21]     Chancery Tr. 52:17; [**REDACTED**].

[22]     Chancery Tr. 56:10-11; [**REDACTED**].

confidentiality provision pursuant to which Rubicon was not permitted to discuss the substance or even the existence of the LOI without GAC's consent. LOI ¶ 9. Because of the duties Rubicon, as an insolvent company, owed to the Rubicon Noteholders, Rubicon's agreement to this provision was a breach of fiduciary duty. Almost immediately following execution by Rubicon of the ill-advised LOI, Rubicon's counsel violated the LOI by informing former counsel to the Rubicon Noteholders of both the existence of the LOI and, among other things, the requirement that Rubicon and the Sale Properties file for bankruptcy with GAC as a stalking horse bidder for the Sale Properties. **[REDACTED]** Understandably, the Rubicon Noteholders reacted to the news of the LOI with shock and dismay. Realizing that the filing of a chapter 11 case would not be a proper exercise of the Board's fiduciary duties,[23] despite their obligations under the LOI, Rubicon and its attorney determined not to continue the negotiations with GAC believing Rubicon was excused from performance (i) based on an implied fiduciary out and (ii) because further negotiations would be a futile exercise.[24]

15. On November 13, 2009, GAC commenced litigation in the Delaware Chancery Court (the "**Chancery Court**") in a case captioned *Global Asset Capital, LLC v. Rubicon U.S. REIT, Inc.*, Case Number C.A. 5071 (the "**Chancery Litigation**"). Among other things, GAC sought a temporary restraining order: (i) preventing Rubicon from disclosing the terms of the LOI; and (ii) preventing Rubicon from soliciting or entertaining any third party offers involving any of the Sale Properties. On November 17, 2009, the Chancery Court entered the TRO against

---

[23] A bankruptcy filing would "result in significant deterioration to the value of the Issuer's assets and thereby materially reduce the likely return to the Noteholders, who constitute the structurally senior lenders of the Issuer and the only creditors likely to receive a return from a sale of these assets under any scenario." Declaration of B. Jeremy Kaufman in Support of Preliminary Objection of Rubicon Noteholders to Motion of Debtors for Order Authorizing Debtors to Assume Exclusive Negotiating Rights Agreement and Granting Related Relief, dated January 25, 2010 (attached hereto as Exhibit G) (hereinafter, the "**Kaufman Decl.**") ¶ 18, Ex. C; *see also id.* ¶¶ 17-19 (describing purchase offers); **[REDACTED]**.

[24] Chancery Tr. 52:17; **[REDACTED]**.

9

Rubicon, holding that the LOI was sufficiently definite as to create enforceable obligations. TRO at 1-2. The Chancery Court also rejected Rubicon's contention that it was excused from performance either by an inherent fiduciary-out, Chancery Tr. 90:9-18, or because negotiations would be futile, holding that the LOI required Rubicon to negotiate in good faith with GAC regarding the PSA. Chancery Tr. 97:17-19. Finally, the Chancery Court rejected Rubicon's contention that the LOI had expired automatically on November 10, 2010. Chancery Tr. 93:14-18.

16.     The TRO enjoined Rubicon from: (i) disclosing any of the contents of the LOI without prior written consent of GAC; (ii) soliciting or entertaining any third party offers involving any of the Sale Properties set forth in the LOI for the duration of the LOI; and (iii) asserting that the LOI had terminated pursuant to the termination provisions set forth therein. *See* TRO at 1-2.

**The Exclusive Negotiating Rights Agreement**

17.     As described above, as a result of the ill-advised LOI and the subsequent breaches, following entry of the TRO, Rubicon faced a difficult situation. Although there was no financial or business reason to file for bankruptcy, staying out of bankruptcy could lead to excessive litigation expenses and increased damage claims. In addition, the TRO enjoined Rubicon from discussing with its only economic stakeholders -- the Rubicon Noteholders -- the litigation and alternative sale options, workouts, or restructurings.     Thus, despite the overwhelming leverage that GAC had, the Debtors entered into negotiations with GAC that resulted in the execution of the Exclusivity Agreement on January 15, 2010.

18.     Among other things, the Exclusivity Agreement provides that (i) commencing on January 15, 2010 until 47 days after the Petition Date, the Debtors will not pursue or entertain

any alternative transactions, including expressly a transaction (such as the Rubicon Noteholders proposed plan of reorganization) that would result in an ownership change of any of the Debtors (the "**GAC Exclusivity Period**"), (ii) during the GAC Exclusivity Period, the Debtors and GAC will attempt to negotiate a stalking horse agreement (to be approved by the Bankruptcy Court), and (iii) upon entry of a final, nonappealable order of the Bankruptcy Court approving the Exclusivity Agreement, the Chancery Court litigation shall be deemed dismissed with prejudice.

19.     On January 20, 2010 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On the following day, the Debtors filed "first-day" motions and the Declaration of Robert Saunders in Support of First Day Motions and Applications (the "**Saunders Declaration**").  Although the Debtors did not disclose it in their pleadings, the bankruptcy filings were precipitated, not for any financial or ordinary business reasons, but as a result of the ill-advised, irresponsible, and reckless actions of Rubicon described above; and the purpose of the bankruptcy filing, also not disclosed in the Debtors' filings, was to implement the Exclusivity Agreement / stalking horse arrangement that Rubicon (and the other Debtors) had entered into with a gun to their heads.  On January 22, 2010, the Debtors filed their motion seeking approval of the Exclusivity Agreement.

**The Rubicon Noteholders' Proposed Plan**

20.     The Rubicon Noteholders have developed a proposed plan of reorganization that provides for a rapid exit from chapter 11 for all the Debtors (the "**Noteholder Plan**"), ending further deterioration in the value of the Debtors' estates and providing **[REDACTED]**.  If the Court grants this Motion and terminates the Debtors' exclusive periods, the Rubicon Noteholders promptly will file the Noteholder Plan which includes the following salient provisions:

    ✓   **[REDACTED]**.

REDACTED VERSION

21.     Under the Noteholder Plan, **[REDACTED]**.  If the Court grants this Motion, the

Debtors will be able to emerge promptly from bankruptcy, **[REDACTED]**, increase the value of

their business, and put an end to chapter 11 cases that should not have been filed, but for the

irresponsible and ill-advised actions of the Debtors.

## RELIEF REQUESTED

22.     By this Motion, the Rubicon Noteholders respectfully request entry of an order

immediately terminating the Debtors' exclusive periods to file and solicit acceptances of a plan

pursuant to section 1121(d) of the Bankruptcy Code.

## CAUSE EXISTS TO TERMINATE THE DEBTORS' EXCLUSIVE PERIODS

23.     The Bankruptcy Code "recognizes the legitimate interests of creditors, whose

money is in the enterprise as much as the debtor's, to have a say in the future of the company."

*In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 160 (Bankr. D. Me. 1982).  In that regard, section

1121(d)(1) of the Bankruptcy Code authorizes the Court to terminate the Debtors' exclusive

periods.  Specifically, section 1121(d)(1) provides:

> ... on request of a party in interest ... and after a notice and a hearing, the court
> may for cause reduce or increase the 120-day period or the 180-day period
> referred to in this section.

11 U.S.C. § 1121(d).

24.     Although the Bankruptcy Code does not define "for cause," section 1121(d)(1)[25]

of the Bankruptcy Code grants the Court great latitude to decide whether to terminate

exclusivity.  *See, e.g., United Savings Assoc. v. Timbers of Inwood Forest Assocs., Ltd. (In re*

*Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987) (noting that

---

[25]     Bankruptcy Code section 1121 was enacted as a compromise of provisions in former Chapter X, which
gave the debtor no ability to propose a plan and former Chapter XI, which gave the debtor indefinite and exclusive
control over the plan process. *See* H.R. Rep. No. 95-595, 95th Cong. 1st Sess. at 231-32. Thus, Congress established
a presumptive 120-day plan filing exclusivity period, and gave the courts the ability to shorten or extend that period
on a case by case basis. *See* 11 U.S.C. § 1121(b), (c), (d).

*NY 240,068,186v3 2-8-10*

bankruptcy code "[s]ection 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors"), *aff'd*, 484 U.S. 365 (1988); *Geriatrics Nursing Home v. First Fidelity Bank, N.A. (In re Geriatrics Nursing Home)*, 187 B.R. 128, 132 (D.N.J. 1995).

25.     Although courts sometimes consider a list of factors when determining whether to terminate exclusivity, those factors are not determinative. *In re Adelphia Commc'ns.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006).[26] *See, e.g., In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997) ("When the Court is determining whether to terminate a debtor's exclusivity, the primary consideration should be whether or not doing so would facilitate moving the case forward."); *see also In re Henry Mayo Newhall Mem'l Hosp.*, 282 B.R. 444, 453 (BAP 9th Cir. 2002) ("We also agree with the *Dow Corning* court that *a transcendent consideration is whether adjustment of exclusivity will facilitate moving the case forward toward a fair and equitable resolution.*") (emphasis added); *Adelphia*, 352 B.R. at 590 (finding that practicality and the ability to move a case forward to a degree not otherwise possible can override a mechanical application of factors).  Here, as a result of the trap the Debtors have put themselves in, these chapter 11 cases cannot move forward unless exclusivity is terminated.  Where, as here, the Debtors cannot propose a plan with a reasonable likelihood of reorganization, the Court should terminate their exclusive periods.  As the Fifth Circuit observed in *In re Timbers of Inwood Forest Assocs., Ltd.*, "the Bankruptcy Code affords several avenues for relief to all

---

[26]     Factors the Court may consider include (a) the size and complexity of the case; (b) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (c) the existence of good faith progress toward reorganization; (d) the fact that the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether an unresolved contingency exists. *Id.*

creditors, secured as well as unsecured." 808 F.2d at 370. One of those avenues is the termination of a debtor's plan exclusivity. *Id.*

26. In determining whether to terminate exclusivity, the Court should also consider not only the ability of the Debtors to spearhead a consensual plan (which the Debtors here do not have) but also whether the creditors have lost faith in the ability of the Debtors to develop and obtain approval of a consensual plan of reorganization. *See, e.g., In the Matter of All Seasons Indus.*, 121 B.R. 1002, 1006 (N.D. Ind. 1990)("While the [C]ourt makes no finding as to whether or not this loss of faith is justified . . . for the purpose of the present motion [to extend exclusivity], it is only necessary to realize that a loss of confidence exists. This is a factor the [C]ourt should and must consider in its determination."). Here, it is uncontroverted that the creditors have no faith in the ability of the Debtors to obtain approval of a consensual plan of reorganization. It is also self-evident that the Debtors objectively lack the ability to pursue or even discuss a consensual plan because they have locked themselves into a value-diminishing sale process that the Rubicon Noteholders vehemently oppose.

**The Debtors Cannot Move the Chapter 11 Cases Forward**

27. In an effort to mitigate to some extent the extremely serious damage to their estates that Rubicon created by ill-advisedly and irresponsibly executing and breaching the LOI, the Debtors entered into the Exclusivity Agreement with GAC. As a result, the Debtors are obligated during the GAC Exclusive Period (which terminates on March 15, 2010)[27] to attempt to reach an agreement with GAC on a stalking horse sale of the Sale Properties. During the

---

[27] Under the Exclusivity Agreement, arguably the Debtors and GAC may extend the GAC Exclusive Period by mutual consent. The Rubicon Noteholders asked the Debtors to commit to withhold their consent to any such extension without the consent of the Rubicon Noteholders or order of the Bankruptcy Court. The Debtors refused and agreed only that they would provide some undefined notice to the Rubicon Noteholders prior to any extension of the GAC Exclusive Periods. The Rubicon Noteholders vehemently oppose any extension of the GAC Exclusive Periods and reserve all their rights with respect thereto.

GAC Exclusive Period, the Debtors are prohibited from considering any proposals from other potential purchasers and from entertaining any other restructuring proposals, including the Noteholder Plan.

28.     The Debtors are trapped in a process that (absent termination of exclusivity) will leave their estates languishing indefinitely in chapter 11, dissipating their value due to unnecessary administrative costs, including the cost of a sale process. If the Debtors reach a stalking horse agreement with GAC, they would next have to seek approval of that agreement from the Bankruptcy Court. Assuming, *arguendo*, that the Bankruptcy Court were to approve the stalking horse agreement and bid procedures proposed therein,[28] the Debtors would then conduct a sale process that would provide potential purchasers with a period of time to diligence the Sale Properties and submit competing bids. Finally, the Debtors would conduct a Court-supervised auction, sometime after which the transaction presumably would be consummated. Based on termination of the GAC Exclusive Period on March 15, 2010, it would be difficult to close the transaction prior to mid-June 2010. If consummation of a sale transaction is conditioned on restructuring the mortgages as GAC required in the LOI and the Term Sheet attached to the Exclusivity Agreement, closing a sale transaction would take considerably longer.

29.     However, regardless of when a section 363 transaction were to close, the Debtors' chapter 11 cases would not be over at closing and creditors would not receive distributions. The contemplated GAC transaction only includes the Sale Properties. Thus, after the sale of the crown jewels, the Debtors' estates will be left with the difficult-to-market JV Interests. As a

---

[28]     The Rubicon Noteholders respectfully submit that the Bankruptcy Court could not approve a GAC stalking horse agreement over the objection of the Rubicon Noteholders as the only creditor class with an economic stake in the outcome, in particular with the proposed Noteholder Plan that would **[REDACTED]** (other than the Rubicon Noteholders). *See In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 208 (3d Cir. 1995) ("The basic purpose behind Chapter 11 of the Bankruptcy Code is to offer protection to the insolvent debtor who seeks rehabilitation through a plan of reorganization.").

REDACTED VERSION

result of the high administrative costs that the Debtors are projecting to run these chapter 11 cases (an average run rate of approximately $1,000,000 per month just for professional fees), the Debtors could be forced to abandon the JV Interests or sell them for a *de minimis* amount because the cost of administering the estates during a sale process could easily exceed the proceeds of a bankruptcy fire sale. Because Overtown is under a 10 month purchase option from receipt of Certificate of Occupancy, that property will likely be even more difficult for the Debtors to sell in a reasonable time frame for a price that would yield any proceeds to the estate.

30. In addition to the foregoing, the sale process into which the Debtors have tied themselves could seriously undermine the Debtors' ability to retain certain important tenants. For example, Robert Duncan Plaza ("**RDP**") in Portland is the largest and most valuable property in the Debtors' portfolio. The Debtors are waiting for U.S. Senate approval of requests from the U.S. General Services Administration ("**GSA**") to issue two new leases to replace the current single master lease covering RDP. Within a month or two of Senate approval of the GSA requests (which could occur within days), GSA will issue two Solicitations of Offers ("**SFOs**") for the new leases. If RDP is still in chapter 11 when it submits its offers, the bankruptcy will be a negative factor the GSA will consider. If a sale process were underway while RDP was bidding on the new leases, this would further undermine RDP's competiveness in pursuit of the new leases. In particular with the current national security concerns, a successful bidder must demonstrate that it is a trustworthy lessor. The ability to make that demonstration is severely, if not fatally, impaired if the property is up for auction as RDP will be unable to identify the ultimate owner.

bar

16

REDACTED VERSION

31.     The fact is that the Debtors have transferred their exclusive period to GAC as part of their settlement agreement.[29]  As a result, the Debtors do not have the ability to pursue a plan of reorganization, regardless of whether the Debtors believe that such a course is in the best interests of their estates and all the Debtors' creditors, as it obviously is in these cases.  The Debtors have relinquished the ability to even *discuss* a plan of reorganization with their creditors or any other party.  However, the Rubicon Noteholders and the Bankruptcy Court are not bound by the Debtors' agreement with GAC.  The Rubicon Noteholders have been completely locked out of any participation in restructuring discussions since the LOI was executed on November 4, 2009, first by the terms of the LOI, next by the terms of the TRO, and finally by the terms of the Exclusivity Agreement.  After almost four months, it is more than time to end the GAC lock-up by permitting the Rubicon Noteholders to file a consensual plan of reorganization that will inure to the benefit of each and every one of the Debtors' creditors.

32.     Because the Debtors cannot move their chapter 11 cases forward, the Bankruptcy Court should terminate exclusivity to permit the Rubicon Noteholders to file the Noteholder Plan, which will allow these chapter 11 cases to advance quickly to a fair and equitable resolution for all parties in interest.

33.     The Noteholder Plan is supported and sponsored by all the Rubicon Noteholders. The Rubicon Noteholders are the only creditors with an economic stake in Rubicon and, accordingly, are the equitable owners of Rubicon.  GAC, with the willing or reluctant assistance of the Debtors, does not have the right to purchase the Rubicon Noteholders' assets for liquidation or fire sale value.  If this were a normal chapter 11 case, it is patently obvious that the

---

[29]     It is important to note that any GAC stalking horse proposal is doomed from the start because it is not the result of the proper exercise of the Debtors' business judgment.  **[REDACTED]**.  The Debtors did not conduct any sort of process through which they selected GAC as the stalking horse.  Rather, faced with the threat of devastating litigation, the Debtors agreed with GAC on a settlement of GAC's LOI claims in consideration for agreeing to file chapter 11 cases and giving GAC a "leg up" as stalking horse bidder.

Debtors would have a duty to co-sponsor the Noteholder Plan because [**REDACTED**]. Here, the Debtors are prohibited from even discussing the Noteholder Plan. The Debtors' creditors should not be penalized because the Debtors have agreed to transfer their exclusive period to GAC and tied their own hands.

34.     Unlike the sale process to which the Debtors are tied, the Noteholder Plan is consistent with "the primary purpose" of chapter 11 – "to promote restructuring of debt and the preservation of economic units rather than a dismantling of the estate." *In re Lyons Transp. Lines, Inc.*, 123 B.R. 526, 534 (Bankr. W.D. Pa. 1991) (noting "the primary focus and effort of a Chapter 11 proceeding should be a reorganization") (internal citations omitted). The Debtors' exclusive periods should not be used to further the denuding of the Debtors' business by the sale to GAC or to any other purchaser when a viable restructuring plan is available, as is the case here. *See In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 208 (3d Cir. 1995) ("The basic purpose behind Chapter 11 of the Bankruptcy Code is to offer protection to the insolvent debtor who seeks rehabilitation through a plan of reorganization."). The Debtors' estates and their creditors are best served by a comprehensive plan of reorganization, consistent with the purposes of chapter 11, that satisfies all parties in interest and preserves the Debtors' going concern value. This can be accomplished in a quick and efficient manner if the Court approves the Motion and immediately terminates the Debtors' exclusive periods.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**CONCLUSION**

WHEREFORE, the Rubicon Noteholders respectfully request that the Court (i) grant the Motion, (ii) immediately terminate the Debtors' Exclusive Periods and allow the Rubicon Noteholders to file their proposed plan, and (iii) grant the Rubicon Noteholders such other and further relief as is just and proper.

Dated: February 8, 2010

GREENBERG TRAURIG, LLP

Dennis A. Meloro (DE Bar No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: melorod@gtlaw.com

-and-

Gary D. Ticoll
Rachel Ehrlich Albanese
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: ticollg@gtlaw.com
albaneser@gtlaw.com

Counsel to the Rubicon Noteholders