# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RUBICON US REIT, INC., et al., | Case No. 10-10160 (BLS) |
| Debtors. | Jointly Administered |

---

**THIRD AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE RUBICON NOTEHOLDERS'[1] SECOND AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FOR RUBICON US REIT, INC. AND ITS AFFILIATED DEBTORS**

DATED: May 24, 2010

GREENBERG TRAURIG, LLP

Dennis A. Meloro (DE Bar No. 4435)
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email:    melorod@gtlaw.com

-and-

Gary D. Ticoll
Rachel Ehrlich Albanese
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email:    ticollg@gtlaw.com
             albaneser@gtlaw.com

Counsel to the Rubicon Noteholders

---

[1]   The holders of 100% of the Global Notes (collectively, the "**Rubicon Noteholders**") are Debt II RB, L.P. and Debt-U RB, L.P. (together, "**Starwood**" and affiliates of Starwood Capital Group Global, L.L.C), KJ Mandrake LLC (an affiliate of Kaufman Jacobs LLC) and JPMorgan Chase Funding Inc. On May 7, 2010, N-Star Real Estate CDO IX, Ltd. ("**Northstar**") entered into an agreement to sell its Global Notes to Starwood, and the sale settled on May 12, 2010.

# TABLE OF CONTENTS

                                                                            **Page**

I.     INTRODUCTION ........................................................................................ 1

II.    OVERVIEW OF THE PLAN ..................................................................... 2

III.   THE DEBTORS' BUSINESSES AND COMMENCEMENT OF CHAPTER 11 CASES ...................................................................................................... 4

      A.    Overview of Debtors' Business .................................................... 4

           1.    Corporate Structure ............................................................ 4

           2.    Corporate History, Business, and Management ................ 4

           3.    The Debtors' Significant Assets ....................................... 5

      B.    Prepetition Capital Structure ....................................................... 5

           1.    The Mortgages ................................................................... 5

           2.    The Global Notes and Other Unsecured Debt ................. 6

           3.    The Series A Preferred Equity Interests ........................... 6

           4.    The Series B Preferred Equity Interests ........................... 6

      C.    Events Leading to the Chapter 11 Cases ..................................... 7

           1.    The Letter of Intent with GAC .......................................... 7

           2.    The Chancery Litigation .................................................... 7

           3.    The Exclusive Negotiating Rights Agreement ................. 7

IV.   SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES .................... 8

      A.    Filing and First Day Orders ......................................................... 8

      B.    Motion to Assume Exclusive Negotiating Rights Agreement ................ 8

      C.    Rubicon Noteholders' Motion to Terminate Exclusivity ........................ 8

      D.    Plan Support Agreements ............................................................. 9

      E.    Debtors' Motion to Appoint Chapter 11 Trustee ....................... 9

*NY 240,251,263.7*

V.    THE PLAN OF REORGANIZATION ................................................................ 10

    A.    Classification and Treatment of Claims and Equity Interests ............................... 10

        1.    Unclassified Claims ................................................................................ 10

            a.    Administrative Claims .................................................................. 10

            b.    Indenture Trustee Fees ................................................................. 11

            c.    Priority Tax Claims ...................................................................... 11

        2.    Unimpaired Classes of Claims and Equity Interests ................................ 12

            a.    Class 1:  Other Priority Claims .................................................... 12

            b.    Class 2:  Secured Claims .............................................................. 12

            c.    Class 3: Mechanics' Lien Claims ................................................. 12

            d.    Class 5: General Unsecured Claims .............................................. 13

            e.    Class 6:  Series A Preferred Equity Interests ................................. 13

        3.    Impaired/Voting Classes of Claims and Equity Interests ......................... 13

            a.    Class 4: Global Note Claims ........................................................ 13

            b.    Class 7:  Series B Preferred Equity Interests ................................ 13

         4.    Impaired Classes of Equity Interests Deemed to Reject ........................... 14

            a.    Class 8:  Rubicon Common Equity Interests ................................ 14

         5.    Reservation of Rights Regarding Claims ................................................. 14

    B.    Means for Implementation of the Plan .................................................................. 14

        1.    Continued Corporate Existence ............................................................... 14

        2.    Corporate Governance ........................................................................... 15

        3.    Cancellation of Existing Securities and Agreements ................................ 15

        4.    Authorization and Issuance of Plan Securities ......................................... 16

            a.    *New Rubicon Common Stock* ...................................................... 16

            b.    *New Rubicon Notes* .................................................................... 16

NY 240,251,263.7

| | 5. | Restructuring Transactions | 16 |
| | 6. | Exemption from Certain Transfer Taxes | 16 |
| C. | | Provisions Governing Distributions | 17 |
| | 1. | Date of Distributions | 17 |
| | 2. | Disbursing Agent | 17 |
| | 3. | No Distribution in Excess of Allowed Amounts | 17 |
| | 4. | Allocation of Distributions | 17 |
| | 5. | Distributions After Effective Date | 17 |
| D. | | Disputed, Contingent, and Unliquidated Claims and Distributions with Respect Thereto | 18 |
| | 1. | Disputed Claims/Process | 18 |
| | 2. | Objections to Claims | 18 |
| | 3. | No Distributions Pending Allowance | 18 |
| | 4. | Distributions After Allowance | 18 |
| E. | | Treatment of Executory Contracts and Unexpired Leases | 18 |
| | 1. | Assumption of Executory Contracts and Unexpired Leases | 18 |
| | 2. | Cure Rights for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan | 19 |
| | 3. | Rejected Contracts and Leases | 19 |
| | 4. | Rejection Damages Bar Date for Rejections Pursuant to Plan | 20 |
| | 5. | Continuing Obligations Owed to Debtors | 20 |
| | 6. | Postpetition Contracts and Leases | 21 |
| F. | | Conditions Precedent to Consummation of the Plan | 21 |
| | 1. | Conditions to Occurrence of the Effective Date | 21 |
| | 2. | Revocation or Withdrawal of the Plan | 21 |

- iii -

G.   Jurisdiction ........................................................................................... 21

    1.   Retention of Jurisdiction ........................................................... 21

    2.   Failure of the Bankruptcy Court to Exercise Jurisdiction.......................... 22

H.   Effect of Confirmation ........................................................................... 22

    1.   Vesting of Assets; Preservation of Causes of Action; Release of Liens........................................................................................... 22

    2.   Discharge .................................................................................. 22

    3.   Injunction Against Interference with Plan ................................. 23

    4.   Releases..................................................................................... 23

        a.   Releases by the Debtors ................................................. 23

        b.   Releases by Holders of Claims and Equity Interests .................... 24

    5.   Exculpation ............................................................................... 24

I.   Miscellaneous Provisions...................................................................... 25

    1.   Payment of Statutory Fees ........................................................ 25

    2.   Intercompany Claims ................................................................ 25

    3.   Exemption from Securities Law ................................................ 25

    4.   Modifications and Amendments ................................................ 25

    5.   Severability of Plan Provisions................................................. 26

    6.   Successors and Assigns and Binding Effect .............................. 26

    7.   Discharge of Debtors' Professionals.......................................... 26

    8.   Revocation, Withdrawal or Non-Consummation ...................... 26

    9.   Plan Supplement ....................................................................... 27

    10.  Notices ...................................................................................... 27

    11.  Governing Law ......................................................................... 27

    12.  Exhibits .................................................................................... 28

    13.  No Admissions.......................................................................... 28

| | | | |
|---|---|---|---|
| VI. | | CONFIRMATION OF THE PLAN | 28 |
| | A. | General | 28 |
| | B. | Acceptances Necessary for Confirmation | 28 |
| | C. | Voting Under the Plan | 29 |
| | D. | Acceptance by Impaired Classes | 29 |
| | E. | Confirmation Without Acceptance by All Impaired Classes | 29 |
| | | 1. No Unfair Discrimination | 30 |
| | | 2. Fair and Equitable Test | 30 |
| | F. | Feasibility | 30 |
| | G. | Best Interests Test/Liquidation Analysis | 31 |
| | H. | Confirmation and Consummation Procedure | 32 |
| | | 1. The Confirmation Hearing | 32 |
| | | 2. Consummation | 33 |
| VII. | | SECURITIES REGISTRATION EXEMPTION | 33 |
| | A. | Securities Registration Exemption | 33 |
| | B. | Section 1145 of the Bankruptcy Code | 33 |
| | C. | Section 4(2) of the Securities Act/Regulation D | 34 |
| | D. | Rule 144 and Rule 144A | 34 |
| VIII. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 35 |
| | A. | Tax Consequences to the Debtors | 36 |
| | B. | Tax Consequences to Certain Claimholders | 37 |
| | C. | Non-United States Claimholders | 37 |
| IX. | | RISK FACTORS | 38 |
| | A. | Bankruptcy Considerations | 38 |
| | B. | Business Risks (Inherent Uncertainty of Financial Projections) | 38 |

NY 240,251,263.7

C.     Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary .................................................................................. 38

D.     The Reorganized Debtors' Businesses, Financial Condition, and Results of Operations Could Be Materially Adversely Affected by the Occurrence of Natural Disasters, such as Earthquakes or Other Catastrophic Events, Including War and Terrorism............................................................................. 39

E.     Tax-Related Risks.......................................................................................... 39

X.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN ......... 40

A.     General .......................................................................................................... 40

B.     Alternative Plans of Reorganization ............................................................ 40

C.     Sale of Assets Under Section 363 with Follow-On Plan ...................................... 40

D.     Liquidation Under Chapter 7 ....................................................................... 40

XI.     DISCLOSURE STATEMENT DISCLAIMER.................................................. 40

A.     Information Contained Herein Is for Soliciting Votes and Exercising Subscription Rights........................................................................................ 40

B.     This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission ............................................................ 40

C.     Reliance on Exemptions from Registration Under the Securities Act.................. 41

XII.     SUMMARY, RECOMMENDATION AND CONCLUSION ......................................... 42

Exhibit A - Plan

Exhibit B - Financial Projections

Exhibit C - Liquidation Analysis

Exhibit D - Unidentified LOI

*NY 240,251,263.7*

# I.  INTRODUCTION[2]

This Third Amended Disclosure Statement (the "**Disclosure Statement**") has been prepared pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and describes the terms and provisions of the Rubicon Noteholders' Second Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code for Rubicon US REIT, Inc. and Its Affiliated Debtors,[3] filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on May 10, 2010 (the "**Plan**"). **For a summary of the Plan, please see Section V of this Disclosure Statement.**

Attached as exhibits to the Disclosure Statement are the following documents:

1.      Plan (Exhibit A)[4];

2.      Financial Projections (Exhibit B);

3.      Liquidation Analysis (Exhibit C); and

4.      Unidentified LOI (as defined below) (Exhibit D).

This Disclosure Statement was prepared by the Rubicon Noteholders (the "**Proponent**") and not the Debtors.  The Proponent does not have full access to the Debtors' books and records, nor does the Proponent have complete knowledge with respect to or access to information related to all aspects of the Debtors' operations.

Not every holder of a Claim against or Equity Interest in the Debtors is entitled to vote on the Plan.  As prescribed by the Bankruptcy Code and the Bankruptcy Rules, Claims against and Equity Interests in the Debtors are placed into Classes.  The Plan designates nine (9) separate Classes of Claims and Equity Interests for the Debtors.  Under the Bankruptcy Code, only Classes of Claims or Equity Interests that are impaired and will be receiving or retaining property under the Plan are entitled to vote to accept or reject the Plan.  Accordingly, the Plan would need to be accepted by holders of Global Note Claims in Class 4 and the holders of Series B Preferred Equity Interests in Class 7, which are the only such Impaired Classes.  The Rubicon Noteholders hold 100% of the Class 4 Claims and, by their Consent to Plan as Plan Proponent [Docket Nos. 354, 355, and 356], have unanimously accepted the Plan.  RFA II holds 100% of the Series B Preferred Equity Interests.  Holders of Claims in Classes 1 (Other Priority Claims),

---

[2]   Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in Article I of the Plan.

[3]   The "**Debtors**" include Rubicon US REIT, Inc. ("**Rubicon**"), Rubicon GSA II, LLC and the twelve "**GSA II Debtors**": Rubicon GSA II Alameda, LLC; Rubicon GSA II Baltimore, LLC; Rubicon GSA II Beacon Station Miami, LLC; Rubicon GSA II Boise BLM, LLC; Rubicon GSA II Boise INS, LLC; Rubicon GSA II Centennial Tacoma, LLC; Rubicon GSA II Fresno, LLC; Rubicon GSA II Kansas City, LLC; Rubicon GSA II New Orleans, LLC; Rubicon GSA II Richmond, LLC; Rubicon GSA II Duncan Plaza Portland, LLC; and Rubicon GSA II Santa Clara, LLC.

[4]   Exhibits to the Plan will be filed as part of the Plan Supplement, which will be filed with the Clerk of the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing, or in accordance with such other deadlines as may be established by the Bankruptcy Court.

2 (Secured Claims), 3 (Mechanics' Lien Claims) and 5 (General Unsecured Claims), and holders of Equity Interests in Classes 6 (Series A Preferred Equity Interests) and Class 9 (Other Equity Interests) are unimpaired. Accordingly, holders of Claims and Equity Interests in these Classes are deemed to accept the Plan and are not entitled to vote to accept or reject the Plan, *see* Article IV of the Plan, entitled, *"Provisions for Treatment of Claims and Equity Interests."* Holders of Equity Interests in Class 8 (Rubicon Common Equity Interests) will neither be receiving nor retaining property or interests in the Debtors or their Estates. Accordingly, holders of Rubicon Common Equity Interests are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan, *see* Article IV of the Plan, entitled, *"Provisions for Treatment of Claims and Equity Interests."*

Pursuant to section 1128 of the Bankruptcy Code, the Proponent will be seeking to schedule the Confirmation Hearing immediately following the hearing to consider approval of the Disclosure Statement, which will be held on June 2, 2010 at 11:30 a.m. (Eastern Time), before the Honorable Brendan Linehan Shannon, United States Bankruptcy Court, 824 North Market Street, 6th Floor, Wilmington, DE 19801. No objections to confirmation of the Plan were served and filed in the manner described in this Disclosure Statement under Section VI.H.1, entitled, *"Confirmation and Consummation Procedure – The Confirmation Hearing."* If, for any reason, the Confirmation Hearing is not scheduled to commence immediately following the hearing on the Disclosure Statement, notice of the rescheduled date or dates, if any, will be provided by an announcement at such hearing or at an adjourned hearing on the Disclosure Statement and will be filed on the electronic case filing docket. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or at any subsequent adjourned date of the Confirmation Hearing.

## II.    OVERVIEW OF THE PLAN

The Proponent believes that the Plan provides the best recoveries possible for creditors and, accordingly, has consented to and accepts the Plan. As discussed in this Disclosure Statement, the Proponent believes that any alternative to confirmation of the Plan, such as liquidation the filing of an alternative plan of reorganization by another party, could result in significant delays, litigation and additional costs.

The Plan provides for the reorganization of each of the Debtors and the treatment of each holder of a Claim against or Equity Interests in the Debtors. Such treatment includes cure and reinstatement of Secured Claims pursuant to section 1124 of the Bankruptcy Code; payment in full of all Mechanics' Lien Claims and General Unsecured Claims on the Effective Date; distribution to each of the Rubicon Noteholders (or their respective designees) of a Pro Rata Share of (i) the New Rubicon Common Stock and (ii) the New Rubicon Notes (or such other shares of the New Rubicon Common Stock and New Rubicon Notes as the Rubicon Noteholders may agree); preservation and reinstatement of Series A Preferred Equity Interests; distribution of Cash on account of the Series B Preferred Equity Interests in the event such class accepts the Plan; cancellation of all existing Rubicon Common Equity Interests; and preservation and reinstatement of Other Equity Interests.

2

The Plan classifies and provides for the treatment of Claims and Equity Interests as summarized below.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims | Estimated Recovery Under Plan |
|---|---|---|---|---|---|
| -- | Administrative Claims | Payment in full in Cash on the Effective Date. | N/A | $4.61 million | 100% |
| -- | Indenture Trustee Fee Claims | Payment in full in Cash on the Effective Date. | N/A | $110,000 | 100% |
| -- | Priority Tax Claims | Payment in full in Cash on the Effective Date. | N/A | $65,000 | 100% |
| 1 | Other Priority Claims | Unimpaired. | No Unimpaired Deemed to Accept | —— | N/A |
| 2 | Secured Claims | Reinstated and Unimpaired. | No Unimpaired Deemed to Accept | $311 million | 100% |
| 3 | Mechanics' Lien Claims | Payment in full in Cash on the Effective Date. | No Unimpaired Deemed to Accept | —— | 100% |
| 4 | Global Note Claims | Pro Rata Share of New Rubicon Common Stock and New Rubicon Notes, on the Effective Date. | Yes Impaired | $82.3 million | 68.72% |
| 5 | General Unsecured Claims | Unimpaired. | No Unimpaired Deemed to Accept | Approximately $1 million | 100% |
| 6 | Series A Preferred Equity Interests | Retained. | No Unimpaired Deemed to Accept | N/A | 100% |
| 7 | Series B Preferred Equity Interests | Pro Rata Share of Cash in the amount of $100,000 on the Effective Date if accept Plan; extinguished as of the Effective Date if reject Plan. | Yes Impaired | N/A | N/A |
| 8 | Rubicon Common Equity Interests | Extinguished as of the Effective Date. | No Impaired Deemed to Reject | N/A | 0% |
| 9 | Other Equity Interests | Retained. | No Unimpaired Deemed to Accept | N/A | 100% |

3

## III. THE DEBTORS' BUSINESSES AND COMMENCEMENT OF CHAPTER 11 CASES

### A. Overview of Debtors' Business

#### 1. Corporate Structure

Rubicon is a Delaware real estate investment trust that directly or indirectly owns 100% of its thirteen affiliated Debtors. Directly, Rubicon owns 100% of Rubicon GSA II, which, in turn, owns 100% of the GSA II Debtors. Rubicon is principally owned by Rubicon America Trust ("**RAT**"), an Australian business trust, formerly listed on the Australian Stock Exchange, now delisted and in liquidation under the laws of Australia. Approximately 0.55% of Rubicon is owned by third parties.

In addition to Rubicon GSA and the GSA II Debtors, Rubicon owns 100% of Rubicon Overtown II, LLC ("**Rubicon Overtown**"), which is a non-Debtor entity that owns a Miami office building (the "**Overtown Property**"). Rubicon also holds between 80-85% interests (the "**JV Interests**") in three non-Debtor joint ventures (the "**JV Companies**"), which collectively own five properties (the "**JV Properties**" and, collectively with the Overtown Property, the "**Other Properties**").

#### 2. Corporate History, Business, and Management

In or about 2004, Rubicon Asset Management Limited ("**RAML**"), in its capacity as a "Responsible Entity"[5] of RAT, formed a U.S. subsidiary – Rubicon, which acquired, among other assets, twelve separate special purpose entities (the GSA II Debtors). Each of the GSA II Debtors owns a single property with one or more office buildings (collectively, the "**GSA II Properties**"), which is principally leased to a single tenant that in every case is a county, state or federal government agency or entity. Each of the GSA II Properties is managed by a local property management company.

RAML was part of Allco Financial Group ("**AFG**"), which used to be a global financial services group, listed on the Australian Stock Exchange and headquartered in Sydney. AFG is now in liquidation, following difficulties in refinancing debt and a share price collapse of 99% since the beginning of the subprime mortgage crisis. As part of the collapse of AFG in Australia, RAT and RAML were placed into liquidation in or about October 2009, pursuant to the laws of Australia. Liquidators were appointed, and the Australian insolvency court ordered RAML to liquidate RAT's assets, including the GSA II Properties.

In or about October 2004, Rubicon entered into the RAL Advisory Agreement with RAL, an affiliate of RAML. Pursuant to the RAL Advisory Agreement, Rubicon is obligated to pay RAL approximately $150,000 per month of fees in consideration of certain management services to be provided by RAL. At least since October 2009, when RAT and RAML were placed into liquidation, Rubicon has had the right to terminate without penalty the

---

[5] Under the laws of Australia, pursuant to the Corporations Act 2001, "Responsible Entity" of a trust means the company named in Australian Securities and Investments Commission's record of the trust as the responsible entity or temporary responsible entity of the trust.

4

RAL Advisory Agreement, which otherwise has an initial term of 15 years. Moreover, Rubicon has substantive claims against RAL in connection with payment of fees for services that were not provided by RAL prior to the Petition Date.

### 3. The Debtors' Significant Assets

Although the value of the GSA II Properties has declined significantly as a result of the global financial crisis, they remain valuable assets with significant potential for appreciation if properly managed. The GSA II Properties are Rubicon's primary assets.

The JV Properties are conventional, suburban office space, which is less attractive to investors in the current real estate market. In addition, the JV Properties are extremely highly leveraged. As a result, a sale of the JV Interests at this time and in this market would be expected to yield less than $1,000,000 in total net proceeds to Rubicon. Overtown is under an option to purchase by the prospective tenant (Miami Dade County) that is expected to yield to Rubicon an amount somewhat less than $2,000,000. The option period runs for 300 days from the date the Certificate of Occupancy is obtained. None of the JV Companies or Rubicon Overtown filed for bankruptcy protection.

### B. **Prepetition Capital Structure**

As of the Petition Date, the Debtors had significant prepetition indebtedness, consisting primarily of amounts outstanding under the Mortgages (as defined below) and the Global Notes (as defined below):

### 1. The Mortgages

Each of the GSA II Properties is secured by separate mortgages (each, a "**Mortgage**" and, collectively, the "**Mortgages**"). Prior to the Petition Date, each of the GSA II Properties generated sufficient cash to service its Mortgage and pay all of its operating expenses. Collectively, the GSA II Properties generate sufficient free cash to pay Rubicon's operating expenses. The aggregate outstanding balance under the Mortgages is approximately $310 million.

Eight of the Mortgages are subject to hyper-amortization, if the Debtors fail to refinance the respective loans by the "Anticipated Repayment Date." The Anticipated Repayment Date for four of the Mortgages encumbering certain GSA II Properties (the "**Hyper-Am Properties**") occurred on or around November 11, 2009. As is common in the collateralized mortgage-backed security market, the Anticipated Repayment Date is the date by which the Debtors anticipated that they would refinance the loans securing the Hyper-Am Properties. The maturity date for the Mortgages encumbering the Hyper-Am Properties is not until 2033 and 2034. The Debtors did not refinance the Mortgages relating to the Hyper-Am Properties prior to the Anticipated Repayment Date. Accordingly, after November 11, 2009, the Mortgages for the Hyper-Am Properties went into hyper-amortization.[6] As a result, the Hyper-

---

[6] Hyper-amortization is not a default under the Mortgages, and, as of the Petition Date, the Debtors were not in default under any of the Mortgages.

Am Properties have higher interest payments, and free cash from each Property is used to amortize the respective Mortgage.

2. The Global Notes and Other Unsecured Debt

As of the Petition Date, the Rubicon Noteholders and Northstar held 100% of the Global Senior Notes (the "**Global Notes**"), issued pursuant to that certain Amended and Restated Indenture, dated as of June 5, 2009 (the "**Indenture**"), among Rubicon as Issuer, RAML in its capacity as Responsible Entity for RAT as Guarantor, and Wilmington Trust Company ("**Wilmington Trust**") as Trustee, in the aggregate principal amount of $99,436,000. As of the Petition Date, the aggregate outstanding principal balance under the Indenture is $82,315,235, all of which was held by the Rubicon Noteholders and Northstar. On May 7, 2010, Northstar entered into an agreement to sell its Global Notes to Starwood, and the sale settled on May 12, 2010. Therefore, as of the date hereof, the Rubicon Noteholders hold in the aggregate 100% of the Global Notes.

The Global Notes are partially secured by certain Rubicon bank accounts and pledges of Rubicon GSA's equity interests in certain of the GSA II Properties. The cash in those bank accounts constitutes cash collateral of the Rubicon Noteholders.

Other than their indebtedness under the Global Notes, the Debtors have unsecured claims aggregating approximately $1 million.[7] The unsecured claims are principally against the GSA II Debtors.

In addition to the obligations described above, the Debtors have other debts and liabilities, including ordinary course payables and obligations under Executory Contracts and Unexpired Leases. Prior to the Petition Date, each of the Debtors generally was paying its obligations as they came due in the ordinary course.

3. The Series A Preferred Equity Interests

REIT Administration, LLC acts as agent and administrator for the one hundred twenty five holders of the Series A Preferred Equity Interests, each of whom provided an investment necessary for Rubicon to comply with the real estate investment trust provisions of the Tax Code (defined in Article VIII below). On information and belief, the aggregate investment of such holders was $125,000. The Series A Preferred Equity Interests are senior to the Series B Preferred Equity Interests.

4. The Series B Preferred Equity Interests

On January 5, 2007, Rubicon issued eleven (11) shares of Series B Preferred Equity Interests with a par value of $0.01 per share, 100% of which is held by RFA II. As of the Petition Date, the total outstanding amount of Series B Preferred Equity Interests was approximately $11,913,000 including amounts due upon liquidation and interest in the amount of 7.905% per annum.

---

[7]   *See* Schedule F of the Debtors, filed with the Bankruptcy Court on March 5, 2010 [Docket Nos. 200 - 213] and the Debtors' Claims Register, filed with the Bankruptcy Court on April 21, 2010 [Docket No. 310].

6

## C.  Events Leading to the Chapter 11 Cases

### 1.  The Letter of Intent with GAC

On or about November 4, 2009, Rubicon entered into a letter of intent ("**LOI**") with Global Asset Capital, LLC ("**GAC**"), pursuant to which Rubicon agreed that it and the other Debtors would file for bankruptcy on an expedited basis (on or before November 10, 2009) and that GAC would act as a stalking horse bidder to purchase the GSA II Properties in bankruptcy. The LOI also required Rubicon to negotiate and enter into a plan support agreement ("**PSA**") with GAC on or before November 9, 2009.

The confidentiality provision in the LOI precluded Rubicon from discussing the substance or even the existence of the LOI without GAC's prior consent. Rubicon believed that the LOI was non-binding and terminated on November 10, 2009 if the Debtors did not file bankruptcy by that date.

### 2.  The Chancery Litigation

On November 13, 2009, GAC commenced litigation in the Delaware Chancery Court (the "**Chancery Court**") in a case captioned *Global Asset Capital, LLC v. Rubicon U.S. REIT, Inc.*, Case Number C.A. 5071 (the "**Chancery Litigation**"). Among other things, GAC sought a temporary restraining order: (i) preventing Rubicon from disclosing the terms of the LOI; and (ii) preventing Rubicon from soliciting or entertaining any third party offers involving any of the GSA II Properties (the "**TRO**").

On November 17, 2009, the Chancery Court entered the TRO against Rubicon. The TRO enjoined Rubicon from: (i) disclosing any of the contents of the LOI without prior written consent of GAC; (ii) soliciting or entertaining any third party offers involving any of the GSA II Properties set forth in the LOI for the duration of the LOI; and (iii) asserting that the LOI had terminated pursuant to the termination provisions set forth therein.

### 3.  The Exclusive Negotiating Rights Agreement

Following entry of the TRO, Rubicon entered into settlement discussions with GAC, resulting in the execution of the Exclusive Negotiating Rights Agreement, executed by Rubicon and all the GSA II Debtors. Among other things, the Exclusive Negotiating Rights Agreement (i) required the Debtors to file chapter 11 cases by January 20, 2010; (ii) required the Debtors to use their best efforts to negotiate a stalking horse agreement for the GSA II Properties in accordance with terms contained in an attached term sheet; and (iii) provided a 52-day "Exclusive Negotiation Period" during which the Debtors were unable to pursue or entertain any other sale or restructuring proposals (the "**GAC Exclusive Period**"). The Exclusive Negotiating Rights Agreement expressly prohibited the Debtors from soliciting, negotiating, or pursuing any transaction(s) contemplating an ownership change of any of the Debtors, including Rubicon. The Exclusive Negotiating Rights Agreement also provided that, upon entry of a final, non-appealable order of the Bankruptcy Court approving the Debtors' assumption of such agreement, the Chancery Litigation shall be deemed dismissed with prejudice.

7

# IV.  SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES

## A.  Filing and First Day Orders

In accordance with the terms of the Exclusive Negotiating Rights Agreement, on January 20, 2010, the Debtors filed their Chapter 11 Cases.  On the following day, the Debtors filed "first day" motions and the Declaration of Robert Saunders in Support of First Day Motions and Applications.

The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to section 1107(a) of the Bankruptcy Code.  On January 26, 2010, the Bankruptcy Court approved certain "first day" orders (i) authorizing and directing the joint administration of the Chapter 11 Cases, (ii) maintaining existing bank accounts and business forms and authorizing the Debtors to use existing cash management systems, and (iii) providing adequate assurance to utility companies and establishing procedures for determining additional adequate assurance.  The Debtors also sought and received authority to retain certain professionals in the Chapter 11 Cases.

## B.  Motion to Assume Exclusive Negotiating Rights Agreement

As described above, as a result of the LOI, the Chancery Litigation and the entry of the TRO, the Debtors entered into negotiations with GAC that resulted in the execution of the Exclusive Negotiating Rights Agreement on January 15, 2010.  On January 22, 2010, the Debtors filed a motion seeking assumption of the Exclusive Negotiating Rights Agreement (the "**Exclusivity Motion**").

On January 26, 2010, the Rubicon Noteholders filed an objection to the Exclusivity Motion.  Wilmington Trust, as Indenture Trustee, ING Clarion Capital Loan Services LLC, the special servicer for certain of the Debtors' Mortgages, and the U.S. Trustee also objected to the Debtors' Exclusivity Motion.  Prior to the hearing on February 22, 2010, the Debtors modified the relief they were seeking in the Exclusivity Motion, and, at the hearing, the Rubicon Noteholders withdrew their objection thereto.  The Court entered an order in a form agreed to by the Rubicon Noteholders approving the request for modified relief.  On March 8, 2010, the GAC Exclusive Period expired without a definitive agreement between the Debtors and GAC.

## C.  Rubicon Noteholders' Motion to Terminate Exclusivity

On February 8, 2010, the Rubicon Noteholders filed a motion pursuant to section 1121(d) of the Bankruptcy Code to terminate the Debtors' exclusive filing and solicitation periods under the Bankruptcy Code and obtain authority to file the Plan (the "**Motion to Terminate**").  Wells Fargo N.A., as special servicer for certain of the Debtors' Mortgages, filed a joinder to the Motion to Terminate.

The Debtors filed an objection to the Motion to Terminate and initiated discovery in connection therewith.  GAC filed a joinder to the Debtors' objection to the Motion to Terminate.  At a hearing held on March 9, 2010, the Court granted the Motion to Terminate and authorized the Rubicon Noteholders to file their Plan.

8

D.    **Plan Support Agreements**

Prior to the hearing on approval of the Disclosure Statement, the Rubicon Noteholders entered into agreements with (i) RAML and RAT (together with their liquidators, administrators and Advisors, the "**RAML Parties**") and (ii) the RFA II Trustee, pursuant to which these parties agreed to support Confirmation of the Plan in exchange for certain consideration.  In addition, on April 26, 2010, REIT Administration, LLC filed on behalf of the Series A Preferred Equity Interests a statement in support of the Plan.[8]

- *RAML Parties.*  The Ruticon Noteholders' agreement with RAML and RAT provides, among other things, (a) that RAML and RAT shall (i) support Confirmation of the Plan and not object to the expedited Confirmation schedule proposed by the Noteholders and (ii) not take any action to oppose or delay Confirmation of the Plan; (b) that the Plan shall include a release of the RAML Parties by the Debtors from any and all claims or Causes of Action arising on or prior to the Effective Date in any way relating to the Debtors, Reorganized Debtors, the Proponent, the Chapter 11 Cases, the Disclosure Statement or the Plan; and (c) for a mutual release of the Noteholders and the RAML Parties.  On April 27, 2010, the RAML Parties filed a statement in support of Confirmation of the Plan.

- *RFA II Trustee.*  The Rubicon Noteholders' agreement with the RFA II Trustee, which was approved on April 29, 2010 by the United States Bankruptcy Court for the Northern District of Illinois, the court in which RFA II's chapter 7 case is pending, provides, among other things, (a) the RFA II Trustee shall (i) support Confirmation of the Plan and the expedited solicitation and Confirmation schedule proposed by the Noteholders and (ii) not take any action to oppose or delay Confirmation of the Plan; and (c) in the event (i) Class 7 votes to accept the Plan, each holder of a Series B Preferred Equity Interest shall receive on account of such Equity Interest its Pro Rata Share of Cash in the aggregate amount of $100,000, and (ii) Class 7 votes to reject the Plan, all Series B Preferred Equity Interests shall be extinguished as of the Effective Date, and each holder of a Series B Preferred Equity Interest shall neither receive nor retain any property on account of such Equity Interest under the Plan.  On May 7, 2010, the RFA II Trustee filed a statement in support of Confirmation of the Plan.

E.    **Debtors' Motion to Appoint Chapter 11 Trustee**

On May 11, 2010 (as amended on May 12, 2010), the Debtors filed (i) an emergency motion to adjourn the hearing on approval of the Disclosure Statement, which was scheduled for May 17, 2010, and the Confirmation Hearing (the "**Motion to Adjourn**"); (ii) an emergency motion to shorten notice on the Motion to Adjourn and schedule a hearing on the Motion to Adjourn on May 17, 2010; (iii) a motion for the appointment of a chapter 11 trustee and invalidating the noteholders' vote for such trustee (the "**Trustee Motion**"); and (iv) an emergency motion to shorten notice on the Trustee Motion and schedule a hearing on the Trustee Motion on May 17, 2010.

---

[8] On April 23, 2010, REIT Administration LLC filed an objection to the Plan but withdrew the objection on April 26, 2010.

9

The Debtors alleged that the relief they sought was necessary because the members of the Debtors' board of directors determined that they were "no longer able to represent the interests of the Debtors or discharge their fiduciary duties" in the chapter 11 cases and, as a result, were resigning their positions effective the earlier of (i) appointment of a trustee and (ii) the date the Court entered an order denying the Trustee Motion, and seeking the immediate appointment of a trustee. The Debtors asserted that the adjournment was necessary to afford a chapter 11 trustee time to take control of the estates and investigate whether the Noteholders' Plan was proposed in good faith.

The Debtors alleged in the Trustee Motion that certain of the Noteholders and their counsel have engaged in improper conduct that purportedly has impugned the integrity of the plan confirmation process and the administration of the Chapter 11 Cases and necessitated the resignation of the Debtors' board members and the appointment of a chapter 11 trustee. The Debtors contend that the Noteholders failed to disclose to the Debtors' stakeholders a purported $405 million offer (the **Unidentified LOI**") to purchase the Debtors' estates, notwithstanding that the Debtors never provided the Noteholders with a copy of the Unidentified LOI (or apprised the Noteholders of its terms) until the Debtors attached it in redacted form as an exhibit to the Trustee Motion. The redacted Unidentified LOI (with date and purported offeror name redacted by the Debtors) is attached as Exhibit D to this Disclosure Statement. The Noteholders believe the Unidentified LOI has numerous infirmities, including various contingencies, diligence requirements, unlimited price adjustments, and uncertainties attendant to the unknown offeror and other issues that render the Unidentified LOI of little or no value.

At the hearing on May 17, 2010, the Court observed that the bad faith arguments in the Trustee Motion constituted an objection to plan confirmation that require affirmative evidence, adjourned the hearing on approval of the Disclosure Statement and the Confirmation Hearing to June 2, 2010, and scheduled the Trustee Motion to be heard on the same date.

## V.    THE PLAN OF REORGANIZATION

### A.    Classification and Treatment of Claims and Equity Interests

#### 1.    Unclassified Claims

##### a.    Administrative Claims

In addition to the Global Note Claims (Class 4), subject to the filing of a motion and approval of the Bankruptcy Court, the Rubicon Noteholders will have an Allowed Administrative Claim pursuant to section 503(b)(3)(D) for the aggregate amount of reasonable professional fees and expenses (including, without limitation, fees and expenses of attorneys, financial advisors, and any consultants) incurred by the Rubicon Noteholders in connection with or related to the Chapter 11 Cases, including, without limitation, in connection with or related to the filing of the Chapter 11 Cases, the preparation of pleadings, the conduct of discovery, the preparation for and participation in hearings before the Bankruptcy Court, and the preparation of the Plan and Disclosure Statement.

Except to the extent that an Allowed Administrative Claim has been paid prior to the Effective Date, each holder of an Allowed Administrative Claim will be entitled to receive in

10

full and complete settlement, release, and discharge of such Claim, payment in full in Cash of the unpaid portion of an Allowed Administrative Claim on the Effective Date.

All final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be made by application filed with the Bankruptcy Court and served on counsel to the Proponent, the Reorganized Debtors, the U.S. Trustee, and other necessary parties in interest no later than thirty (30) days after the Final Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such applications must be filed and served on counsel to the Proponent, the Reorganized Debtors, the U.S. Trustee, and the requesting Professional or other Entity on or before the date that is fifteen (15) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application was served.

The Reorganized Debtors may, without application to or approval by the Bankruptcy Court, retain professionals and pay reasonable professional fees and expenses in connection with services rendered to them after the Effective Date.

b. Indenture Trustee Fees

Notwithstanding any provision contained in this Plan to the contrary, all unpaid Indenture Trustee Fees incurred through the Effective Date will be paid in Cash on the Effective Date or as soon thereafter as is practicable by the Reorganized Debtors as Administrative Claims, without the need for application to, or approval of, any court. To the extent that there are Indenture Trustee Fees incurred after the Effective Date, the Reorganized Debtors will pay such fees in accordance with the terms of the Indenture. The Indenture Trustee's Charging Lien will be discharged solely upon payment in full of the Indenture Trustee Fees. Nothing herein will be deemed to impair, waive or discharge the Charging Lien for any fees and expenses not paid by the Reorganized Debtors.

To the extent that the Indenture Trustee provides services related to distributions pursuant to the Plan, the Indenture Trustee will receive from the Reorganized Debtors, without further court approval, reasonable compensation for such services and reimbursement of reasonable expenses, including, but not limited to, reasonable attorney's fees and expenses, incurred in connection with such services. These payments will be made on terms agreed to among the Indenture Trustee and the Reorganized Debtors.

c. Priority Tax Claims

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Effective Date, each holder of an Allowed Priority Tax Claim will be entitled to receive in full and complete settlement, release, and discharge of such Claim, payment in Cash of the unpaid portion of an Allowed Priority Tax Claim on the Effective Date.

11

2.     Unimpaired Classes of Claims and Equity Interests

a.     Class 1: Other Priority Claims

*Impairment and Voting*: Class 1 is unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Distributions*:     On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment of such Allowed Other Priority Claim, each Allowed Other Priority Claim will be unimpaired in accordance with section 1124 of the Bankruptcy Code. Allowed Other Priority Claims which are not due and payable on or before the Effective Date will be paid thereafter in the ordinary course of business in accordance with the terms and conditions of any agreement that governs such Allowed Other Priority Claim or in accordance with the course of practice between the Debtors and such holder with respect to such Claim. Nothing in the preceding sentence will be construed to waive the Proponent's or any other Person's right (if any) to object, on any basis, to any Claim asserted against a Debtor.

b.     Class 2: Secured Claims

*Impairment and Voting*: Class 2 is unimpaired by the Plan. Each holder of an Allowed Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Distributions*: Except to the extent that a holder of a Secured Claim agrees to different treatment, at the sole option of the Proponent, (i) each Allowed Secured Claim will be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code; (ii) each holder of an Allowed Secured Claim will receive Cash in an amount equal to such Allowed Secured Claim, including any interest on such Allowed Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Secured Claim becomes an Allowed Secured Claim or as soon thereafter as is practicable; or (iii) each holder of an Allowed Secured Claim will receive the Collateral securing its Allowed Secured Claim and any interest on such Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code on the later of the Effective Date and the date such Allowed Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

c.     Class 3: Mechanics' Lien Claims

*Impairment and Voting*: Class 3 is unimpaired by the Plan. Each holder of an Allowed Mechanics' Lien Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Distributions*:     On the Effective Date, each holder of an Allowed Mechanics' Lien Claim (i) will receive on account of such holder's Allowed Mechanics' Lien Claim, payment in full, in Cash, with postpetition interest calculated at the Federal Judgment Rate, and (ii) such Claim will be discharged. Nothing in the preceding sentence will be

12

construed to waive a Debtor's, the Proponent's and any other Person's right (if any) to object, on any basis, to any Claim asserted against a Debtor. The applicable Mechanic's Lien will be deemed released and the property relating thereto will be free and clear of such Lien.

d.      Class 5: General Unsecured Claims

*Impairment and Voting*: Class 5 is unimpaired by the Plan. Each holder of an Allowed General Unsecured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Distributions*: On the Effective Date, or as soon thereafter as is reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of such Allowed General Unsecured Claim, each Allowed General Unsecured Claim will be unimpaired in accordance with section 1124 of the Bankruptcy Code. Allowed General Unsecured Claims which are not due and payable on or before the Effective Date will be paid thereafter in the ordinary course of business in accordance with the terms and conditions of any agreement that governs such Allowed General Unsecured Claim or in accordance with the course of practice between the Debtors and such holder with respect to such Claim. Nothing in the preceding sentence will be construed to waive the Proponent's or any other Person's right (if any) to object, on any basis, to any Claim asserted against a Debtor.

e.      Class 6: Series A Preferred Equity Interests

*Impairment and Voting.* Class 6 is unimpaired by the Plan. Each holder of a Series A Preferred Equity Interest is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Distributions.* Each holder of a Series A Preferred Equity Interest shall retain such Equity Interest.

3.      Impaired/Voting Classes of Claims and Equity Interests

a.      Class 4: Global Note Claims

*Impairment and Voting*: Class 4 is impaired by the Plan. Each holder of an Allowed Global Note Claim is entitled to vote, has consented to, and accepts the Plan.

*Distributions*: On the Effective Date, in full and complete satisfaction of its Allowed Claim, each holder of an Allowed Global Note Claim will be entitled to receive (or to have its designee(s) receive) its Pro Rata Share of (x) the New Rubicon Common Stock and (y) the New Rubicon Notes (or such other shares of the New Rubicon Common Stock and New Rubicon Notes as the Rubicon Noteholders may agree).

b.      Class 7: Series B Preferred Equity Interests

*Impairment and Voting.* Class 7 is impaired by the Plan. Each holder of a Series B Preferred Equity Interest is entitled to vote on the Plan.

NY 240,251,263.7

*Distributions.*

(i)      *Treatment If Class 7 Accepts the Plan.* In the event Class 7 accepts the Plan, on the Effective Date, each holder of a Series B Preferred Equity Interest will receive its Pro Rata Share of Cash in the aggregate amount of $100,000 in full satisfaction of its Series B Preferred Equity Interests. All Series B Preferred Equity Interests will be extinguished as of the Effective Date.

(ii)      *Treatment If Class 7 Rejects the Plan.* In the event Class 7 rejects the Plan, all Series B Preferred Equity Interests will be extinguished as of the Effective Date, and the holder of the Series B Preferred Equity Interests will neither receive nor retain any property on account of such Equity Interests under the Plan.

4.      <u>Impaired Classes of Equity Interests Deemed to Reject</u>

a.      Class 8: Rubicon Common Equity Interests

*Impairment and Voting*: Class 8 is impaired by the Plan. Each holder of a Rubicon Common Equity Interest is conclusively presumed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

*Distributions*: All Rubicon Common Equity Interests will be extinguished as of the Effective Date, and each holder of a Rubicon Common Equity Interest will neither receive nor retain any property on account of such Equity Interest under the Plan.

5.      <u>Reservation of Rights Regarding Claims</u>

Except as otherwise explicitly provided in the Plan, nothing in the Plan will affect the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**B.**      **Means for Implementation of the Plan**

1.      <u>Continued Corporate Existence</u>

Except as provided herein, each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate entity, with all of the powers of a corporation under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law. Except as provided herein, as of the Effective Date, all property of the estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, will vest in such Reorganized Debtor, free and clear of all claims, liens, charges, other encumbrances, and interests. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, and dispose of property and settle or compromise any claims without the supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may (but is not required to) pay the

14

charges that it incurs on or after the Effective Date for professional fees and expenses, disbursements, expenses, or related support services (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

### 2.  Corporate Governance

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the members, managing member and managers of each Reorganized Debtor (other than Reorganized Rubicon) will continue to serve in such capacity for each such Reorganized Debtor unless the Proponent otherwise designates. The Proponent will designate the initial board of directors of Reorganized Rubicon, the members of which will be disclosed in the Plan Supplement.

The officers of the Debtors immediately prior to the Effective Date will serve as the initial officers of the respective Reorganized Debtors on and after the Effective Date and in accordance with any employment and severance agreements with the Reorganized Debtors and applicable non-bankruptcy law, unless the Proponent designates replacement officers. On and after the Effective Date, the officers of each of the Reorganized Debtors will be determined by the applicable board of directors, member or managing member (as the case may be) of each Reorganized Debtor, as applicable and in accordance with each Reorganized Debtor's governing documents.

The entry of the Confirmation Order will constitute authorization and direction for the Debtors to take or cause to be taken all corporate or other actions necessary or appropriate to consummate and implement the provisions of the Plan prior to, on and after the Effective Date, and all such actions taken or caused to be taken will be deemed to have been authorized and approved by the Bankruptcy Court. On the Effective Date, adoption by the Reorganized Debtors of their applicable amended articles of incorporation, partnership agreements, operating agreements or other similar documents, as applicable, copies of which are included in the Plan Supplement, will be deemed to have occurred. All such actions will be deemed to have occurred and will be in effect from and after the Effective Date pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action by the partners, members, stockholders, administrators, agents, officers or directors of the Debtors.

### 3.  Cancellation of Existing Securities and Agreements

Except (i) for purposes of evidencing a right to distributions under the Plan, (ii) with respect to executory contracts or unexpired leases that have been assumed by any of the Debtors, (iii) as otherwise provided for herein, or (iv) in any contract, instrument or other agreement or document created in connection with the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to Article IV of the Plan, all Rubicon Common Equity Interests, Series B Preferred Equity Interests and any promissory notes, other instruments evidencing any Claims, other than a Claim that is being reinstated and rendered unimpaired, will be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the Debtors under the notes, share certificates and other agreements and instruments governing such Claims, Rubicon Common Equity Interests and Series B Preferred Equity Interests will be discharged. The holders of or parties to such canceled notes, shares,

15

share certificates and other agreements and instruments will have no rights arising from or relating to such notes, shares, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.

    4.    <u>Authorization and Issuance of Plan Securities</u>

    a.    *New Rubicon Common Stock.* On the Effective Date, Reorganized Rubicon will issue and deliver in accordance with the Plan all Plan-related securities and documents, including the New Rubicon Common Stock, without the need for any further corporate action.

    b.    *New Rubicon Notes.* On the Effective Date, Reorganized Rubicon will issue and deliver the New Rubicon Notes in accordance with Section 4.4 of the Plan, without the need for any further corporate action.

    5.    <u>Restructuring Transactions</u>

    On, as of, or after the Effective Date, the Reorganized Debtors may enter into such transactions and may take such actions as may be necessary or appropriate, in accordance with any applicable state law, to effect a corporate or operational restructuring of their businesses, to otherwise simplify the overall corporate or operational structure of the Reorganized Debtors, to achieve corporate or operational efficiencies, or to otherwise improve financial results; provided that such transactions or actions are not otherwise inconsistent with the Plan or the Distributions to be made under the Plan. Such transactions or actions may include any mergers, conversions, consolidations, restructurings, dispositions, liquidations, closures, or dissolutions, as may be determined by the Reorganized Debtors to be necessary or appropriate.

    On, as of, or after the Effective Date, the Reorganized Debtors will enter into the REIT Management Agreement with the REIT Advisor. The REIT Management Agreement will provide, among other things, for quarterly property management fees and incentives. For more discussion, please see Section VI.F of this Disclosure Statement.

    6.    <u>Exemption from Certain Transfer Taxes</u>

    Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer from the Debtors to the Reorganized Debtors or any other Person or Entity pursuant to the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment. State or local governmental officials or agents are directed to forego the collection of any such tax or governmental assessment and to accept for Filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## C. Provisions Governing Distributions

### 1. Date of Distributions

Unless otherwise provided herein, any distributions and deliveries to be made under the Plan will be made on the Effective Date or as soon as practicable thereafter.

### 2. Disbursing Agent

a. All distributions under this Plan will be made by the Reorganized Debtors as Disbursing Agent or such other entity designated by the Reorganized Debtors as a Disbursing Agent on the Effective Date.

b. If any holder's distribution is returned as undeliverable, a reasonable effort will be made to determine the current address of such holder. Unless otherwise agreed between the Reorganized Debtors and the Disbursing Agent, amounts in respect of undeliverable distributions will be returned to the Reorganized Debtors and held in trust by the Reorganized Debtors until the date that is the first (1st) anniversary of the Effective Date, after which date all unclaimed property will revert to the Reorganized Debtors free of any restrictions thereon and the claims of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Nothing contained in the Plan will require the Debtors, the Reorganized Debtors or any Disbursing Agent to attempt to locate any holder of an Allowed Claim.

### 3. No Distribution in Excess of Allowed Amounts

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim will receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim (excluding payments on account of interest due and payable pursuant to the Plan).

### 4. Allocation of Distributions

All distributions received under the Plan by holders of Claims will be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim.

### 5. Distributions After Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims will be deemed to have been made on the Effective Date.

17

D.    **Disputed, Contingent, and Unliquidated Claims and Distributions with Respect Thereto**

1.    Disputed Claims/Process

Holders of Claims and Equity Interests are not required to file proofs of claim with the Bankruptcy Court and will be subject to the Bankruptcy Court process only to the extent provided in the Plan. On and after the Effective Date, except as otherwise provided herein, all Claims will be paid in the ordinary course of business of the Reorganized Debtors. If the Debtors dispute any Claim, such dispute will be determined, resolved or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and will survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided, however,* that the Debtors and/or the Proponent may elect, each at their sole option, to object under section 502 of the Bankruptcy Code with respect to any proof of claim filed by or on behalf of a holder of a Claim.

2.    Objections to Claims

Except insofar as a Claim is Allowed under the Plan, the Proponent, the Debtors, and the Reorganized Debtors will be entitled to object to any Claims. Any objection to Claims will be served and filed on or before the latest of (a) sixty (60) days after the Effective Date, (b) forty-five (45) days after a Claim is filed with the Bankruptcy Court or (c) such date as may be fixed by the Bankruptcy Court.

3.    No Distributions Pending Allowance

If a holder of a Claim files a proof of Claim and the Proponent, the Debtors, or the Reorganized Debtors object to such Claim, no payment or distribution provided under the Plan will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

4.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) will be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date of a Final Order allowing such Claim, the Disbursing Agent will provide to the holder of such Claim the d distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

E.    **Treatment of Executory Contracts and Unexpired Leases**

1.    Assumption of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, each Debtor will be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party unless such Executory Contract or Unexpired Lease (a)

18

was previously assumed or rejected upon motion by a Final Order, (b) previously expired or terminated pursuant to its terms, or (c) is the subject of any pending motion or dispute, including to assume, to assume on modified terms, to reject, to terminate pursuant to its terms, or to make any other disposition filed by the Debtors on or before the Confirmation Date. The Confirmation Order will constitute an order of the Bankruptcy Court under section 365(a) of the Bankruptcy Code approving the assumption and/or assignment of prepetition Executory Contracts and Unexpired Leases described above, as of the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors and the Reorganized Debtors reserve the right to assert that any license, franchise and partially performed contract is a property right and not an Executory Contract. Contracts or leases entered into after the Petition Date will be performed by the Reorganized Debtors in the ordinary course of business.

Each Executory Contract and Unexpired Lease that is assumed and relates to the use, ability to acquire, or occupancy of real property will include (a) all modifications, amendments, supplements, restatements, and other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such Executory Contract or Unexpired Lease and (b) all Executory Contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to a Final Order of the Bankruptcy Court.

2. <u>Cure Rights for Executory Contracts and Unexpired Leases Assumed Pursuant to Plan</u>

Any monetary amounts, including interest, by which each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan is in default will be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any Reorganized Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure will occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; *provided, however,* that the Debtors (with the written consent of the Proponent) or Reorganized Debtors, as applicable, will be authorized to reject any Executory Contract or Unexpired Lease to the extent the Debtors (after consultation with the Proponent) or Reorganized Debtors, conclude that the amount of the Cure obligation as determined by such Final Order, renders assumption of such Executory Contract or Unexpired Lease unfavorable to the Debtors or Reorganized Debtors.

3. <u>Rejected Contracts and Leases</u>

Except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, none of the Executory Contracts and Unexpired Leases to which the Debtors are a party will be rejected under the Plan; *provided, however,* that the Debtors reserve the right (with the consent of the

19

Proponent), at any time prior to the Effective Date, to seek to reject any Executory Contract or Unexpired Lease to which a Debtor is a party. Notwithstanding the foregoing, unless the RAL Advisory Agreement has been amended or terminated in accordance with terms satisfactory to the Proponent, the Debtors shall notify RAL on the Confirmation Date, by letter in form and substance acceptable to the Proponent in its sole discretion, of the termination of the RAL Advisory Agreement based on defaults of RAL and other good reasons, and **the RAL Advisory Agreement will be rejected pursuant to Section 8.3 of the Plan, effective as of the Confirmation Date.**

### 4. Rejection Damages Bar Date for Rejections Pursuant to Plan

If the rejection of an Executory Contract or Unexpired Lease pursuant to Section 8.3 of the Plan results in a Claim, then such Claim will be forever barred and will not be enforceable against the Debtors or Reorganized Debtors or any of their properties unless a proof of claim is filed and served upon counsel to the Proponent and the Reorganized Debtors within ten (10) days after the date of entry of an order authorizing the rejection of such Executory Contract or Unexpired Lease or such other date as the Court may order.

### 5. Continuing Obligations Owed to Debtors

c. All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order will be deemed and treated as Executory Contracts pursuant to the Plan and will be assumed by the respective Debtors and Reorganized Debtors and will continue in full force and effect. All other insurance policies will revest in the Reorganized Debtors.

d. To the extent any insurance policy under which the insurer has a continuing obligation to pay the Debtors or a third party on behalf of the Debtors is held by the Bankruptcy Court to be an Executory Contract, such insurance policy will be treated as though it is an Executory Contract that is assumed or deemed to be an Executory Contract pursuant to section 365 of the Bankruptcy Code and Section 8.1 of the Plan. Any and all Claims (including Cure) arising under or related to any insurance policies or related insurance agreements that are assumed by the Debtors prior to or as of the Effective Date: (i) will not be discharged; (ii) will be Allowed Administrative Claims; and (iii) will be paid in full in the ordinary course of business of the Reorganized Debtors as set forth in Section 2.1(b) of the Plan.

e. Continuing obligations of third parties to the Debtors under insurance policies, contracts, or leases that have otherwise ceased to be Executory Contracts or have otherwise expired on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, to provide indemnification, contribution or reimbursement, to grant rights of first refusal, to maintain confidentiality, or to honor releases, will continue and will be binding on such third parties notwithstanding any provision to the contrary in the Plan, unless otherwise specifically terminated by the Debtors or by Final Order of Bankruptcy Court.

NY 240,251,263.7

## 6.    Postpetition Contracts and Leases

The Debtors will not be required to assume or reject any contract or lease entered into by the Debtors after the Petition Date. Any such contract or lease will continue in effect in accordance with its terms after the Effective Date, unless the Proponent or the Reorganized Debtors have obtained a Final Order of the Bankruptcy Court approving rejection or other termination of such contract or lease. Contracts or leases entered into after the Petition Date will be performed by the Reorganized Debtors in the ordinary course of business.

## F.    **Conditions Precedent to Consummation of the Plan**

### 1.    Conditions to Occurrence of the Effective Date

The following conditions precedent to the occurrence of the Effective Date, with respect to a particular Debtor, must be satisfied or waived by the Proponent on or prior to the Effective Date:

f.    with respect to each Debtor, the Confirmation Order (i) has been entered and become a Final Order, and (ii) is in form and substance reasonably satisfactory to the Proponent;

g.    with respect to each Debtor, all actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan will have been effected in form and substance reasonably acceptable to the Proponent; and

a.    the RAL Agreement will be amended, terminated, and/or rejected in a manner satisfactory to the Proponent.

### 2.    Revocation or Withdrawal of the Plan

The Proponent reserves the right to revoke or withdraw the Plan with respect to one or more Debtors prior to the Effective Date. If the Proponent revokes or withdraws the Plan with respect to a particular Debtor, in whole prior to the Confirmation Date, then such Debtor's Plan will be deemed null and void. In such event, nothing contained in the Plan will constitute or be deemed a waiver or release of any Claims or Interests by or against such Debtor or any other Person or to prejudice in any manner the rights of the Debtors, the Proponent or any Person in any further proceedings involving the Debtors. The Proponent reserves the right to withdraw the Plan as to any Debtor and proceed with confirmation of the Plan with respect to any other Debtor. In such event, nothing contained in the Plan will constitute or be deemed a waiver or release of any Claims against or Interests in such Debtor withdrawn from the Plan or any other Person or to prejudice in any manner the rights of such Debtor, the Proponent, or any Person in any further proceedings involving such withdrawn Debtor.

## G.    **Jurisdiction**

### 1.    Retention of Jurisdiction

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise

ordered by the Bankruptcy Court, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, these Chapter 11 Cases and the Plan to the fullest extent permitted by law (*provided, however,* that notwithstanding the foregoing, with respect to all civil proceedings arising in or related to the Chapter 11 Cases and the Plan, the Bankruptcy Court will have original but not exclusive jurisdiction, in accordance with section 1334(b) of title 28 of the United States Code).

## 2. Failure of the Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Section 10.1 of the Plan, the provisions of Article X of the Plan will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## H. Effect of Confirmation

### 1. Vesting of Assets; Preservation of Causes of Action; Release of Liens

Except as otherwise provided in the Plan or in the Confirmation Order, and pursuant to section 1123(b)(3) and section 1141(b) and (c) of the Bankruptcy Code, on the Effective Date, all of the property and assets of the Debtors and all Causes of Action, including, without limitation, any Claims against (i) the Debtors' current and former officers, directors, attorneys and financial advisors in connection with or related to the LOI, the Chancery Litigation, the Exclusive Negotiating Rights Agreement and the filing and prosecution of the Chapter 11 Cases, and (ii) RAL and its current and former officers, directors, attorneys, and financial advisors in connection with or related to its management and/or control of the Debtors and any transactions or agreements among or between them and the Debtors including, without limitation, the RAL Advisory Agreement, will automatically revest in the Reorganized Debtors, free and clear of all Claims, Liens and Equity Interests. The Reorganized Debtors (directly or through the Disbursing Agent) will make all distributions under the Plan. Thereafter, each Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court. As of the Effective Date, all such property of each Reorganized Debtor will be free and clear of all Claims, Liens and Equity Interests, except as specifically provided in the Plan or the Confirmation Order, and the Reorganized Debtors will receive the benefit of any and all discharges under the Plan.

### 2. **Discharge**

a. **Except as otherwise provided in Section 7.1 of the Plan or in the Confirmation Order, to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, (x) the rights afforded in the Plan and the payments and distributions to be made hereunder will discharge all existing debts and Claims, and terminate all Rubicon Common Equity Interests, and (y) on the Effective Date, to the fullest extent permitted by law, all existing Claims against the Debtors and all Rubicon Common Equity Interests will**

22

be, and will be deemed to be, discharged and terminated, and all holders of Claims and Rubicon Common Equity Interests will be precluded and enjoined from asserting against the Debtors, the Reorganized Debtors and the Proponent, or any of their assets or properties, any other or further Claims, debts, rights, Causes of Action, or Equity Interests relating to the Debtors based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Equity Interest.

b.     Except as otherwise provided in Section 7.1 of the Plan or in the Confirmation Order, to the fullest extent permitted by law, (x) all Persons or Entities who have held, now hold, or may hold Rubicon Common Equity Interests in or Claims against any of the Debtors and (y) all other parties in interest, along with their respective present and former employees, agents, officers, directors, principals, advisors and Affiliates, are permanently enjoined from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind with respect to such Claim or Rubicon Common Equity Interest against the Debtors or the Reorganized Debtors, (ii) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order against the Debtors or the Reorganized Debtors, (iii) creating, perfecting or enforcing any encumbrance of any kind against the Debtors or the Reorganized Debtors, or (iv) asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors or the Reorganized Debtors, with respect to such Claim or Rubicon Common Equity Interest. Such injunction will extend to any successors of the Debtors and the Reorganized Debtors and their respective properties and interest in properties.

3.     Injunction Against Interference with Plan

Upon the entry of the Confirmation Order, the Debtors, all holders of Claims and Equity Interests, and other parties in interest, along with their respective present and former employees, agents, officers, directors, principals or Advisors, will be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

4.     **Releases**

a.     **Releases by the Debtors**

(i)     **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and any Person or Entity seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, will be deemed to forever release, waive, and discharge the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction,**

23

event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Proponent, the Chapter 11 Cases, the Disclosure Statement or the Plan, and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors against the Released Parties.

(ii)     As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, the Reorganized Debtors, and any Person or Entity seeking to exercise the rights of the Debtors' Estates, including, without limitation, any successor to the Debtors or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release, waive, and discharge the RAT Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Proponent, the Chapter 11 Cases, the Disclosure Statement or the Plan, and that may be asserted by or on behalf of the Debtors, the Estates, or the Reorganized Debtors against the RAT Released Parties.

b.     Releases by Holders of Claims and Equity Interests

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, (i) each holder of a Claim or an Equity Interest that votes in favor of the Plan (or is deemed to accept the Plan), and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted after the Effective Date, each holder of a Claim or an Equity Interest that does not vote to accept the Plan (or is deemed to reject the Plan) will be deemed to unconditionally forever release, waive and discharge each of the Debtors and the Released Parties, from any and all claims, obligations, suits, judgments, damages demands, debts, rights, Causes of Action and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Proponent, the Chapter 11 Cases, the Disclosure Statement or the Plan; *provided, however*, that Section 11.4(b) of the Plan will not operate as a waiver or release of any Causes of Action arising out of the willful misconduct, intentional fraud, or criminal liability of any such Person or Entity.

5.     Exculpation

h.     Except as otherwise provided in the Plan, on the Effective Date, the Exculpated Parties will neither have, nor incur any liability to any holder of a Claim or an Equity Interest, the Debtors, the Reorganized Debtors, or any other party in

24

interest, or any of their respective agents, employees, representatives, advisors, attorneys, or Affiliates, or any of their successors or assigns, for any prepetition or postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of intentional fraud, willful misconduct or criminal conduct; *provided, however*, that the foregoing exculpation will not be deemed to, release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, any of the Exculpated Parties' obligations or covenants arising pursuant to the Plan or the Confirmation Order.

        i.      Notwithstanding any other provision of the Plan, no holder of a Claim or an Equity Interest, the Debtors, the Reorganized Debtors, no other party in interest, none of their respective agents, employees, representatives, advisors, attorneys, or Affiliates, and none of their respective successors or assigns will have any right of action against any of the Exculpated Parties for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of intentional fraud, willful misconduct, or criminal conduct.

## I.    Miscellaneous Provisions

### 1.    Payment of Statutory Fees

On the Effective Date, and thereafter as may be required, the Debtors will pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

### 2.    Intercompany Claims

Notwithstanding anything to the contrary herein, any debts held by a Debtor against another Debtor will be adjusted and discharged to the extent determined appropriate by the Proponent, taking into account the economic condition of the applicable Reorganized Debtor.

### 3.    Exemption from Securities Law

The issuance of the New Rubicon Common Stock pursuant to the Plan will be exempt from any securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code. See Article VII of this Disclosure Statement for more information regarding the securities registration exemption.

### 4.    Modifications and Amendments

The Proponent may alter, amend, or modify the Plan or any exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. The

Proponent will provide parties in interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court. After the Confirmation Date and prior to the Effective Date, the Proponent or the Reorganized Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan.

5.      Severability of Plan Provisions

If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

6.      Successors and Assigns and Binding Effect

The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Person or Entity, including, but not limited to, the Reorganized Debtors and all other parties in interest in the Chapter 11 Cases.

7.      Discharge of Debtors' Professionals

On the Effective Date, the Debtors' Professionals and agents will be discharged from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases, which will remain in full force and effect according to their terms. The Professionals retained by the Debtors and the respective members thereof will not be entitled to compensation and reimbursement of expenses for services rendered to or on behalf of the Debtors after the Effective Date.

8.      Revocation, Withdrawal or Non-Consummation

The Proponent reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If the Proponent revokes or withdraws the Plan prior to the Confirmation Date, or if Confirmation or the Effective Date does not occur, then (a) the Plan will be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be

26

deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, will (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Equity Interests in, the Debtors, or other claims by or against the Debtors, or any Person or Entity, (ii) prejudice in any manner the rights of the Debtors, the Proponent or any Person or Entity in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by the Debtors, the Proponent, or any other Person or Entity.

9. <u>Plan Supplement</u>

The Plan Supplement will be filed with the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing or by such later date as may be established by order of the Bankruptcy Court. Upon such filing, all documents set forth in the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal business hours. Holders of Claims or Equity Interests may obtain a copy of any document set forth in the Plan Supplement upon written request to the Proponent as provided below.

10. <u>Notices</u>

Any notice, request, or demand required or permitted to be made or provided under the Plan will be in writing and addressed as follows:

> Dennis A. Meloro
> Greenberg Traurig LLP
> 1007 North Orange Street, Suite 1200
> Wilmington, Delaware 19801
> Telephone: (302) 661-7000
> Facsimile: (302) 661-7360
> Email: melorod@gtlaw.com
>
> -and-
>
> Gary D. Ticoll
> Rachel Ehrlich Albanese
> Greenberg Traurig LLP
> 200 Park Avenue
> New York, New York 10166
> Telephone: (212) 801-9200
> Facsimile: (212) 801-6400
> Email: ticollg@gtlaw.com
> albaneser@gtlaw.com

11. <u>Governing Law</u>

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Delaware will govern the construction and implementation of the Plan and (except as may otherwise be provided in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation of the Debtors

27

will govern corporate governance matters with respect to the Debtors, in each case without giving effect to the principles of conflicts of law thereof.

### 12. Exhibits

All exhibits are incorporated into and made part of the Plan as if set forth in full therein, and, to the extent not annexed thereto, such exhibits will be filed with the Bankruptcy Court at least ten (10) days prior to the Confirmation hearing. Copies of exhibits can be obtained upon written request to the Proponent as provided above, or by downloading such exhibits from the Bankruptcy Court's website at *http://www.deb.uscourts.gov* (registration required). To the extent any exhibit is inconsistent with the terms of the Plan or the Disclosure Statement, unless otherwise ordered by the Bankruptcy Court, the non-exhibit portion of the Plan will control.

### 13. No Admissions

Notwithstanding anything in the Plan to the contrary, nothing contained in the Plan will be deemed an admission by the Proponent or any other Person with respect to any matter set forth in the Plan, including, without express or implied limitation, liability on any Claim or the propriety of a Claim's classification.

## VI. CONFIRMATION OF THE PLAN

### A. General

In order to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including that (i) the Plan has classified Claims and Equity Interests in a permissible manner, (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code, (iii) the Proponent has proposed the Plan in good faith, and (iv) the Proponent's disclosures as required by chapter 11 of the Bankruptcy Code have been adequate and have included information concerning all payments made or promised by the Debtors or the Proponent in connection with the Plan. The Proponent believes that all of these requirements will have been met by the date of the Confirmation Hearing and will seek rulings of the Bankruptcy Court to such effect at that hearing.

### B. Acceptances Necessary for Confirmation

The Bankruptcy Code also requires that the Plan will have been accepted by the requisite votes of creditors entitled to vote (except to the extent that "cramdown" is available under section 1129(b) of the Bankruptcy Code); that the Plan be feasible (that is, confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization); and that the Plan be in the "best interests" of all impaired creditors that do not vote to accept the Plan (that is, that impaired creditors which do not vote to accept the Plan will receive pursuant to the Plan value at least equal to the value they would receive in a liquidation of the Debtors under chapter 7). To confirm the Plan, the Bankruptcy Court must find that all of these requirements are met. Thus, even if the voting creditors accept the Plan by the requisite votes, the Bankruptcy Court must make independent findings in respect of the Plan's feasibility

and whether it is in the best interests of any impaired dissenting creditors entitled to vote before it may confirm the Plan. These statutory conditions to confirmation are discussed below.

## C. Voting Under the Plan

Each Impaired Class of Claims and Equity Interests that is receiving a distribution under the Plan is entitled to vote separately to accept or reject the Plan. Accordingly, each holder of a Claim in Class 4 (Global Note Claims) and the holder of the Equity Interests in Class 7 (Series B Preferred Equity Interests) are entitled to vote to accept or reject the Plan. By the Proponents' Consents to Plan as Plan Proponent [Docket Nos. 354, 355, and 356], Class 4 has accepted the Plan. An authorized representative of the RFA II Trustee will attend the Disclosure Statement hearing and vote on the Plan for Class 7. Holders of Claims in Classes 1 (Other Priority Claims), 2 (Secured Claims), 3 (Mechanics' Lien Claims) and 5 (General Unsecured Claims) and holders of Equity Interests in Class 6 (Series A Preferred Equity Interests) and 9 (Other Equity Interests) are deemed to accept the Plan and will not be entitled to vote to accept or reject the Plan. Holders of Equity Interests in Class 8 (Rubicon Common Equity Interests) are deemed to reject the Plan and will not be entitled to vote to accept or reject the Plan.

## D. Acceptance by Impaired Classes

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of impaired claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

## E. Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all other impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

Class 7 (Series B Preferred Equity Interests) and Class 8 (Rubicon Common Equity Interests) are the only Classes that could reject the Plan. The Proponent is seeking confirmation of the Plan notwithstanding that (i) Class 8 is impaired and deemed to reject the Plan and (ii) Class 7 is impaired and may reject the Plan. The Plan satisfies the cramdown requirements as to both Classes of Equity Interests in Rubicon because Class 4 (Global Note Claims) constitutes the requisite impaired accepting Class and no Class of Equity Interests in Rubicon junior to Class 7 or 8 is receiving or retaining any property under the Plan.

NY 240,251,263.7

1.    No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.    Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the non-accepting class, the test sets different standards depending on the type of claims or equity interests in such class.

Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a)(i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (b) the holders of such secured claims realize the indubitable equivalent of such claims.

Unsecured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain, on account of such claim, property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan, on account of such junior claim or junior equity interest, any property.

Equity Interests: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (i) the allowed amount of any fixed liquidation preference to which such holder is entitled; (ii) any fixed redemption price to which such holder is entitled; or (iii) the value of such interest; or (b) if the class does not receive the amount as required under (a) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

F.    **Feasibility**

The Bankruptcy Code requires the Proponent to demonstrate that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial

30

reorganization, unless provided for in the Plan. As demonstrated by the financial projections annexed hereto as Exhibit B, confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

Rubicon is projected to exit bankruptcy with over $8 million in free Cash available. The Debtors will use this Cash to satisfy cure amounts and Claims that are entitled to Cash distributions.

The proposed business strategy for the Reorganized Debtors is to create value through aggressive management of the lease renewal process and to opportunistically sell properties with long-term leases in place. The Reorganized Debtors will be managed by the REIT Advisor. The REIT Management Agreement will provide for quarterly property management fees and incentives.

Through well-timed and targeted dispositions, the Proponent expects for the Reorganized Debtors to achieve higher sales prices than could be obtained today due to, among other things, (i) increases in the underlying value of GSA II Properties following lease renewals, (ii) projected increases in net operating income due to active management of the lease renewal process, (iii) marketing the GSA II Properties individually as opposed to a bulk sale, and (iv) future sales being sponsored by a healthy REIT as opposed to a distressed seller.

Additionally, the Rubicon Noteholders are all well-capitalized companies with extensive experience in real estate investment. The principals and advisors of the anticipated REIT Advisor, who developed and are to be charged with executing the business plan of the Reorganized Debtors, are experts in the field of government-leased property with over 70 years of combined experience in that business.[9]

G.      **Best Interests Test/Liquidation Analysis**

With respect to each impaired class of claims and interests, confirmation of a plan of reorganization requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test." This analysis requires the court to determine what the holders of allowed claims and allowed interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.

---

[9] The REIT Advisor is responsible for and distinct from the property-level management companies. Among other things, the REIT Advisor (i) oversees the preparation of the budget and operating plans for the Reorganized Debtors and the implementation of such plans, (ii) oversees necessary administrative functions for the Reorganized Debtors, (iii) reports to, consults with and provides recommendations to Reorganized Rubicon's board of directors in respect of financial policies or investment objectives for Reorganized Rubicon, (iv) negotiates on behalf of the Reorganized Debtors with banks or lenders, (v) obtains appraisals or reports where appropriate or requested, (vi) provides the Reorganized Debtors with all necessary cash management services, (vii) engages such third parties as the REIT Advisor deems appropriate for the proper functioning of the Reorganized Debtors, and (viii) provides such other services as the Reorganized Debtors may request or the REIT Advisor may determine.

NY 240,251,263.7

To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is compared with the value offered to such classes of claims and interests under the plan. In a chapter 7 liquidation, the cash available for distribution to creditors would consist of the proceeds resulting from the disposition of the unencumbered assets of the debtor, augmented by the unencumbered cash held by the debtor at the time of the commencement of the liquidation case. Such cash amount would be reduced by the costs and expenses of the liquidation, including, but not limited, to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and by such additional administrative and priority claims that may result from the termination of the debtor's business and the use of chapter 7 for the purpose of liquidation.

In applying the "best interests" test, it is possible that the claims and interests in a chapter 7 case may not be classified according to the priority of such claims and interests, but instead be subjected to contractual or equitable subordination. In light of the fact that the Plan provides for payment in full or reinstatement of all Allowed Claims (other than the Rubicon Noteholders), the Series A Preferred Equity Interests and the Other Equity Interests and payment of $100,000 on account of the Series B Preferred Equity, each such holder will receive under the Plan not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

Although holders of Rubicon Common Equity Interests will not receive or retain any property under the Plan, in a liquidation scenario, no Equity Interest holder would receive a distribution or retain any interest in the Debtors. The Liquidation Analysis attached as Exhibit C to this Disclosure Statement demonstrates that, in the event the Debtors were liquidated, the Rubicon Noteholders and the General Unsecured Creditors would be impaired and would receive a substantially reduced recovery on account of their Claims; therefore, holders of Equity Interests would not receive or retain any property in a chapter 7 liquidation.

H.  **Confirmation and Consummation Procedure**

1.  The Confirmation Hearing

The Bankruptcy Court, after notice, will hold a confirmation hearing. Pursuant to section 1128 of the Bankruptcy Code, the Proponent will be seeking to schedule the Confirmation Hearing immediately following the hearing to consider approval of the Disclosure Statement, which will be held on May 17, 2010 at 11:30 a.m. (Eastern Time), before the Honorable Brendan Linehan Shannon, United States Bankruptcy Court, 824 North Market Street, 6th Floor, Wilmington, DE 19801. No objections to confirmation of the Plan were served and filed in the manner described in this Disclosure Statement under Section VI.H.1, entitled, *"Confirmation and Consummation Procedure – The Confirmation Hearing."* If, for any reason, the Confirmation Hearing is not scheduled to commence immediately following the hearing on the Disclosure Statement, notice of the rescheduled date or dates, if any, will be provided by an announcement at such hearing or at an adjourned hearing on the Disclosure Statement and will be filed on the electronic case filing docket. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the

32

adjourned date made at the Confirmation Hearing or at any subsequent adjourned date of the Confirmation Hearing.

### 2. Consummation

The Plan will be consummated and will be deemed substantially consummated on the Effective Date. For a more detailed discussion of the conditions precedent to the Effective Date and the impact of the failure to meet such conditions, see Article IX of the Plan.

## VII. SECURITIES REGISTRATION EXEMPTION

### A. Securities Registration Exemption

Except as set forth below, the securities to be issued pursuant to the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law to the fullest extent permitted by section 1145 of the Bankruptcy Code.

These issuances would also be exempt from registration under the Securities Act or any similar federal, state, or local law in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.

### B. Section 1145 of the Bankruptcy Code

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code are deemed to have been issued pursuant to a public offering. Therefore, the securities issued pursuant to a section 1145 exemption may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by section 4(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, such securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, recipients of securities issued under the Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, or (b) offers to sell securities offered or sold under the plan for the holders of such securities, or (c) offers to buy securities issued under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (d) is an issuer, as used in section 2(11) of the Securities Act, with respect to such securities.

The term "issuer," as used in section 2(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person

33

under direct or indirect common control with such issuer. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the voting securities of a reorganized debtor may be presumed to be a "control person."

To the extent that persons deemed "underwriters" receive securities under the Plan, resales of such securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act; *provided, however,* that any sale will be subject to the restrictions on transfer and assignment contained in the operating, limited liability company and or shareholders agreement of Holdco or the Reorganized Debtors, as applicable, and applicable law.

C.    **Section 4(2) of the Securities Act/Regulation D**

Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(2) of the Securities Act.

The term "issuer," as used in section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.

Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities." As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law. Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act; *provided, however,* that any sale will be subject to the restrictions on transfer and assignment contained in the operating agreement, limited liability company and or shareholders agreement of Holdco or the Reorganized Debtors, as applicable, and applicable law.

D.    **Rule 144 and Rule 144A**

Under certain circumstances, affiliated holders of restricted securities may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (*e.g.,* that the availability of current public information with respect to the issuer, volume limitations, and notice and manner

34

of sale requirements), specified persons who resell restricted securities or who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold, will not be deemed to be "underwriters" as defined in section 2(11) of the Securities Act. Rule 144 provides that: (i) a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period if there is not current public information regarding the issuer at the time of the sale; and (ii) an affiliate may sell restricted securities after a six month holding period if at the time of the sale there is current public information regarding the issuer and after a year holding period if there is not current public information regarding the issuer at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sale and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (*e.g.*, the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons, "dealers" registered as such pursuant to section 15 of the Exchange Act, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers. Subject to certain qualifications, Rule 144A does not exempt the offer or sale of securities that, at the time of their issuance, were securities of the same class of securities then listed on a *national securities exchange* (registered as such pursuant to section 6 of the Exchange Act) or quoted in a United States automated inter-dealer quotation system.

IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A RECIPIENT OF SECURITIES PURSUANT TO THE PLAN MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE ISSUER OF SUCH SECURITIES, THE PROPONENT MAKES NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRANSFER THE SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN. ACCORDINGLY, THE PROPONENT RECOMMENDS THAT POTENTIAL RECIPIENTS OF SECURITIES UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRANSFER SUCH SECURITIES.

## VIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain significant U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain holders of Allowed Claims. This summary is based upon the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), Treasury regulations promulgated thereunder, judicial decisions and published rules and pronouncements of the Internal Revenue Service ("**IRS**"), all as in effect on the date hereof. Due to the unsettled nature of several of the tax issues presented by the Plan, the differences among creditors in the nature of their Claims, and the possibility that future events, including amendments to the Tax Code, the Treasury regulations promulgated thereunder or court

decisions, could change the U.S. federal income tax consequences of the transactions, the tax consequences described below are only general descriptions that are subject to significant uncertainties.

This discussion does not address the tax treatment of certain persons that may be subject to special treatment under the Tax Code (for example, foreign taxpayers, government authorities or agencies, broker-dealers, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, including qualified plans, and investors in pass-through entities), or any aspect of state, local or foreign taxation. In addition, this discussion does not address the U.S. federal income tax consequences to holders whose Claims are entitled to reinstatement or are otherwise unimpaired under the Plan. No opinion has been requested, and the Proponent has not sought, nor does it intend to seek, a ruling from the IRS regarding the tax consequences of the Plan. Consequently, there can be no assurance that the treatment set forth below will be accepted by the IRS.

Accordingly, the following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of an Allowed Claim. All holders of Allowed Claims are urged to consult their own tax advisors for the federal, state, local and other tax consequences applicable to them under the Plan.

IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Allowed Claims are hereby notified that: (i) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Allowed Claims for the purpose of avoiding penalties that may be imposed on them under federal, state or local tax laws, (ii) such discussion is written in connection with the promotion or marketing of the transactions or matters discussed herein, and (iii) holders of Allowed Claims should seek advice based on their particular circumstances from an independent tax advisor.

A.     **Tax Consequences to the Debtors**

The Debtors will realize cancellation of indebtedness income ("**CODI**") for any debt discharged as part of the bankruptcy. In the case of New Equity Interests issued in exchange for Class 4 Claims, the CODI is equal to the difference, if any, between (i) the stated principal amount of the Global Notes, and (ii) the fair market value of the New Equity Interests issued in exchange for the Global Notes. As a result of the bankruptcy, the CODI will be excluded from the Debtors' gross income. However, any excluded CODI will reduce the Debtors' tax attributes, including net operating losses and the basis of its assets. In general, if the discharge occurs as a result of a bankruptcy proceeding, the reduction in basis cannot exceed the excess of (i) the aggregate of the bases of the property held by the Debtors' immediately after the discharge over (ii) the aggregate of the liabilities of the Debtors immediately after the discharge. The Debtors may elect to apply any portion of the reduction of tax attributes first against the basis of the Debtors' depreciable property.

36

Unless holders of Class 4 Claims receive 50 percent of the equity of the Reorganized Debtors, by vote and value, in exchange for certain qualified debt, the use of the Debtors' net operating losses and built-in-losses will be subject to limitation. The Global Notes are treated as qualified debt for this purpose if the holder of such Global Notes has held such Global Notes for at least 18 months on the date of the filing of the bankruptcy proceeding, or in the case of Global Notes that were issued in the Debtors' ordinary course of business, were held by the holder at all times since the Global Notes were issued by the Debtors.

## B. Tax Consequences to Certain Claimholders

### 1. Holders of Class 4 Claims

A holder of a Class 4 Claim who receives New Rubicon Common Stock and New Rubicon Notes with respect to such Claim pursuant to the Plan generally will be required to recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between (i) the sum of (x) the fair market value (determined on the Effective Date) of the New Rubicon Common Stock plus (y) the "issue price" of the New Rubicon Notes received in exchange therefor (other than property received in respect of accrued interest) and (ii) such holder's adjusted basis in the Claim (other than any portion of the Claim attributable to accrued interest). Assuming the New Rubicon Notes have "adequate stated interest," the issue price of the New Rubicon Notes will be the stated principal amount of such New Rubicon Notes. To the extent the Class 4 Claim is treated as a security for federal income tax purposes, then the exchange of such Claim for New Rubicon Stock and New Rubicon Notes would be partially nontaxable with respect to the receipt of the New Rubicon Stock.

### 2. Holders of Class 7 Claims

A holder of a Class 7 Claim who receives Cash with respect to such Claim pursuant to the Plan generally will be required to recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between (i) the amount of cash received with respect to such Claim and (ii) such holder's adjusted basis in the Claim, except to the extent that such amount is attributable to accrued dividends, which are taxed as dividends.

## C. Non-United States Claimholders

A non-United States holder of a Class 4 Claim, if any, should consult with its own tax advisor as to particular tax consequences to it of receiving a distribution under the Plan in exchange for its Class 4 Claim.

THE PRECEDING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR GENERAL INFORMATION ONLY AND IS NOT TAX ADVICE. THE PROPER TAX TREATMENT OF A HOLDER OF AN ALLOWED CLAIM IS UNCERTAIN IN VARIOUS RESPECTS. ACCORDINGLY, EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR AS TO PARTICULAR TAX CONSEQUENCES TO IT OF PURCHASING, HOLDING AND DISPOSING OF THE NEW EQUITY INTERESTS AND NEW NOTES, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY PROPOSED CHANGES IN

NY 240,251,263.7

APPLICABLE LAWS.

## IX.   **RISK FACTORS**

The risk factors identified below should not be regarded as constituting the only risks involved in connection with the Plan and its implementation.

### A.   **Bankruptcy Considerations**

Although the Proponent believes that the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

### B.   **Business Risks (Inherent Uncertainty of Financial Projections)**

Although the Financial Projections set forth in Exhibit B suggest that the Reorganized Debtors will be able to meet all of their financial obligations following confirmation of the Plan, these projections are dependent upon certain assumptions related to the expected state of regional real estate markets, which may or may not prove accurate.

The current crisis in the global credit and financial markets and the inability of corporate borrowers to access the debt markets may materially and adversely affect the Reorganized Debtors' ability to obtain sufficient financing to operate their business on a going forward basis.

The business of the Reorganized Debtors involves the ownership and leasing of real properties, and the ownership and leasing of real properties is subject to a varying degree of risks.  The yield available from any such real property depends on the amount of revenue generated and expenses incurred.  The revenues generated by, expenses incurred with respect to, and the value of, a particular real property may be adversely affected by a number of factors, including, without limitation: the cyclical nature of the real estate market; national, regional and local economic climates; local real estate market conditions; fluctuations in operating costs; changes in interest rates; tenant creditworthiness; and the availability, cost and terms of financing.  Real estate values are also affected by such factors as government regulations (including those governing usage, improvements, zoning and taxes), interest rate levels, the availability of financing and potential liability under changing environmental and other laws.

### C.   **Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a Result, Actual Results May Vary**

*Any financial information that may be contained in this Disclosure Statement has not been audited.*  In preparing this Disclosure Statement, the Proponent relied on financial data derived from the Debtors' books and records that was available at the time of such preparation.  Although the Proponent has used its reasonable business judgment to ensure the

38

accuracy of the financial information provided in this Disclosure Statement, and while the Proponent believes that such financial information fairly reflects the financial condition of the Debtors, the Proponent is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the Financial Projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (i) the timing of confirmation and consummation of the Plan in accordance with its terms; (ii) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Reorganized Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses, or make necessary capital expenditures; (iii) general business and economic conditions; and (iv) overall industry performance and trends.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Proponent believes that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

D.    **The Reorganized Debtors' Businesses, Financial Condition, and Results of Operations Could Be Materially Adversely Affected by the Occurrence of Natural Disasters, such as Earthquakes or Other Catastrophic Events, Including War and Terrorism**

Natural disasters, such as fires and earthquakes, or other catastrophic events could adversely affect the Reorganized Debtors' business and operating results. The Proponent cannot predict the impact that any future natural disasters or catastrophic events will have on the ability of the Reorganized Debtors to sustain their business activities. The Proponent also cannot ensure that the Reorganized Debtors will be able to obtain any insurance coverage with respect to occurrences of natural disasters or catastrophic events and any losses that could result from these acts.

E.    **Tax-Related Risks**

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Plan. Interested parties should read carefully the discussions set forth in Section VIII of this Disclosure Statement regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtors and the Reorganized Debtors and to certain holders of Claims who are entitled to vote to accept or reject the Plan.

39

# X.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

### A.     General

If the Plan is not confirmed, the potential alternatives include (i) alternative plans of reorganization under chapter 11, (ii) dismissal of the Chapter 11 Cases, or (iii) conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

### B.     Alternative Plans of Reorganization

If the Plan is not confirmed, the Proponent may attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of their assets.

The Proponent has concluded that the Plan enables creditors and Equity Interest holders to realize the most value under the circumstances and that holders of Claims and Equity Interests would receive greater recoveries under the Plan than under a different business reorganization scenario or in a chapter 7 liquidation.

### C.     Sale of Assets Under Section 363 with Follow-On Plan

If the Plan is not confirmed, a sale may be pursued whereby substantially all of the Debtors' assets will be sold pursuant to section 363 of the Bankruptcy Code. After such 363 sale is consummated, a chapter 11 plan may be filed with the Bankruptcy Court with respect to any remaining assets.

### D.     Liquidation Under Chapter 7

If no chapter 11 plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate the Debtors' assets. The Proponent believes that liquidation under chapter 7 would result in significantly reduced distributions being made to stakeholders than those provided for in the Plan. *See* Exhibit C (Liquidation Analysis) hereto.

# XI.    DISCLOSURE STATEMENT DISCLAIMER

### A.     Information Contained Herein Is for Soliciting Votes and Exercising Subscription Rights

The information contained in this Disclosure Statement is provided pursuant to section 1125 of the Bankruptcy Code governing the solicitation of acceptances of the Plan and may not be relied upon for any other purpose.

### B.     This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the

United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### C. Reliance on Exemptions from Registration Under the Securities Act

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The issuance of equity under the Plan has not been registered under the Securities Act or similar state securities or "blue sky" laws. As described in Article VII of this Disclosure Statement, the issuance of equity under the Plan will be exempt from registration under the Securities Act to the fullest extent permitted by section 1145 of the Bankruptcy Code.

NY 240,251,263.7

## XII. SUMMARY, RECOMMENDATION AND CONCLUSION

In the opinion of the Proponent, the treatment of Claims and Equity Interests under the Plan contemplates a far greater recovery than that which is likely to be achieved under other alternatives for the reorganization or liquidation of the Debtors. Accordingly, the Proponent believes that Confirmation of the Plan is in the best interests of the Debtors and their Estates.

Dated: May 24, 2010                    Respectfully submitted,

                                       RUBICON NOTEHOLDERS,
                                       as Proponent of the Plan


KJ Mandrake LLC                        Debt II RB, L.P. and Debt-U RB, L.P.
(an affiliate of Kaufman Jacobs LLC)   (affiliates of Starwood Capital Group Global,
                                       L.L.C)

By:    Mandrake Management Co. LLC,
       Manager                         By:    _____
                                       Name:
                                       Title:

By:    _____
Name:  Jeremy Kaufman
Title: Manager



JPMORGAN CHASE FUNDING INC.

By:    _____
Name:  Chadwick S. Parson
Title: Managing Director


42

## XII.  SUMMARY, RECOMMENDATION AND CONCLUSION

In the opinion of the Proponent, the treatment of Claims and Equity Interests under the Plan contemplates a far greater recovery than that which is likely to be achieved under other alternatives for the reorganization or liquidation of the Debtors.  Accordingly, the Proponent believes that Confirmation of the Plan is in the best interests of the Debtors and their Estates.

Dated: May 24, 2010          Respectfully submitted,

RUBICON NOTEHOLDERS,
as Proponent of the Plan

| | |
|---|---|
| KJ Mandrake LLC<br>(an affiliate of Kaufman Jacobs LLC) | Debt II RB, L.P. and Debt-U RB, L.P.<br>(affiliates of Starwood Capital Group Global, L.L.C) |
| By:    Mandrake Management Co. LLC,<br>      Manager | By: _____<br>Name: *Chris Graham*<br>Title: *Managing Director* |
| By: _____<br>Name: Jeremy Kaufman<br>Title: Manager | |

JPMORGAN CHASE FUNDING INC.

By: _____
Name:   Chadwick S. Parson
Title:   Managing Director

42

## XII.  SUMMARY, RECOMMENDATION AND CONCLUSION

In the opinion of the Proponent, the treatment of Claims and Equity Interests under the Plan contemplates a far greater recovery than that which is likely to be achieved under other alternatives for the reorganization or liquidation of the Debtors. Accordingly, the Proponent believes that Confirmation of the Plan is in the best interests of the Debtors and their Estates.

Dated: May 24, 2010                Respectfully submitted,

RUBICON NOTEHOLDERS,
as Proponent of the Plan


KJ Mandrake LLC                          Debt II RB, L.P. and Debt-U RB, L.P.
(an affiliate of Kaufman Jacobs LLC)     (affiliates of Starwood Capital Group Global,
                                         L.L.C)

By:   Mandrake Management Co, LLC,        By:  _____
      Manager                            Name: _____
                                         Title: _____

By:   _____
Name: Jeremy Kaufman
Title: Manager



JPMORGAN CHASE FUNDING INC.

By:   _____
Name:  Chadwick S. Parson
Title:  Managing Director


42